The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

|  |  |
|---|---|
| IN RE WASHINGTON MUTUAL, INC. SECURITIES, DERIVATIVE & ERISA LITIGATION | No. 2:08-md-1919 MJP |

|  |  |
|---|---|
| This Document Relates to:<br>*Flaherty & Crumrine Preferred Income Fund Incorporated, et al. v. Killinger, et al.,* No. C09-1756 MJP | FLAHERTY & CRUMRINE PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT<br><br>ORAL ARGUMENT REQUESTED |

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    PROCEDURAL HISTORY .....................................................................................3

III.   STATEMENT OF FACTS ......................................................................................6

       A.  Summary of the Action.................................................................................6

       B.  WaMu Disregarded Prudent Underwriting and Appraisal Practices............6

       C.  False and Misleading Assurances to Investors Prior to the 2006 Offering ..................8

       D.  The False and Misleading 2006 Offering Documents....................................9

       E.  False and Misleading Assurances to Investors Prior to the 2007 Offering.................11

       F.  The False and Misleading 2007 Offering Documents....................................16

       G.  WaMu Collapses and the Truth Is Revealed ...............................................18

IV.    LEGAL STANDARDS .........................................................................................21

V.     ARGUMENT.........................................................................................................22

       A.  F&C Pleads Violations of the Federal Securities Laws...............................22

           1.  The Officer Defendants Violated §10(b); F&C Relied Upon the Officer Defendants' False and Misleading Statements ..................22

           2.  The Individual Defendants' §20(a) Argument Is Moot .......................24

           3.  F&C's §18 Claims Are Not Time-Barred .........................................24

       B.  F&C Properly Pleads Violations of California's Corporate Securities Law ..............26

           1.  Goldman Sachs Violated California Corporations Code §§25401/25501............27

               a.  Goldman Offered the Preferred Shares to Flaherty & Crumrine in California; F&C May Avail Itself of California's Investor Protection Statutes.................28

               b.  Goldman Sachs' Reasonable Investigation Defense Raises an Improper Question of Fact.................31

           2.  The Officer Defendants Are Liable for Materially Assisting Goldman Sachs Pursuant to California Corporations Code §25504.1.................35

           3.  The Officer Defendants Violated California Corporations Code §§25400/25500 .................35

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

C.   F&C Properly Pleads Additional California State Law Claims....................................36

   1.   The Officer Defendants Are Liable for Common Law and Statutory Fraud.........36

   2.   All Defendants Are Liable for Negligent Misrepresentation ...............................37

        a.   The Director Defendants Are Liable for the False and Misleading
             Statements Attributable to Them....................................................................38

        b.   F&C Justifiably Relied Upon the Initial Purchasers' Statements in the
             Offering Circulars; "Disclaimers" Do Not Shield the Initial Purchasers
             from Liability..................................................................................................40

        c.   The Initial Purchasers Had No Reasonable Grounds to Believe
             the Statements in the Offering Circulars to be True .......................................42

D.   Flaherty & Crumrine Suffered a Legally Cognizable Economic Loss.......................43

VI.   CONCLUSION................................................................................................................47

## TABLE OF AUTHORITIES

*Alliance Mortgage Co. v. Rothwell,*
  10 Cal. 4th 1226 (1995)............................................................35, 37

*Apollo Capital Fund LLC v. Roth Capital Partners, LLC,*
  158 Cal. App. 4th 226 (2007)...................................................35, 37, 38

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009)...................................................................21

*Barter Fair v. Jackson County,*
  372 F.3d 1128 (9th Cir. 2004)...,.......................................................23

*Bell Atlantic Corp. v. Twombly,*
  550 U.S 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)...............................21

*Bily v. Arthur Young,*
  3 Cal. 4th 370 (1992)................................................................40, 42

*Bowden v. Robinson,*
  67 Cal. App. 3d 705 (1977)......................................................27, 28, 31

*Cadlo v. Owens-Illinois, Inc.,*
  125 Cal. App. 4th 513 (2004).............................................................38

*Collins v. Winex Invs. LLC,*
  No. 08 CV 51-L (CAB), 2009 U.S. Dist. LEXIS 25553
  (S.D. Cal. Mar. 27, 2009)................................................................35

*Desai v. Deutsche Bank Sec. Ltd.,*
  573 F.3d 931 (9th Cir. 2009).............................................................23

*DuraPharms., Inc. v. Broudo,*
  544 U.S 336 (2005)..................................................................22

*Edelstein v. Ryland Corp.,*
  No. 95-56349, 1997 U.S. App. LEXIS 8123
  (9th Cir. Apr. 18, 1997)................................................................43

*Eisenbaum v. W. Energy Res.,*
  218 Cal. App. 3d 314 (Cal. App. 4th Dist. 1990)........................................31

*Eminence Capital, LLC v. Aspeon, Inc.,*
  316 F.3d 1048 (9th Cir. 2003).........................................................47

*Ernst & Ernst v. Hochfelder,*
  425 U.S. 185 (1976)....................................................................24

*First Nationwide Bank v. Gelt Funding Corp.,*
  27 F. 3d 763 (2d Cir. 1994)...........................................................46

*Gabriel Capital v. Natwest Fin., Inc.,*
  94 F. Supp. 2d 491 (S.D.N.Y. 2000).....................................................41

iii

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

*Garcia v. Superior Court,*
    50 Cal. 3d 728 (1990).................................................................44

*General Signal Corp. v. MCI Telecommunications Corp.,*
    66 F.3d 1500 (9th Cir. Cal. 1995)...............................................31

*Hall v. The Superior Court of Orange County,*
    150 Cal. App. 3d 411 (1983)................................................27, 31

*Hollinger v. Titan Capital Corp.*
    914 F.2d 1564 (9th Cir. 1990)....................................................24

*Housley v. City of Poway,*
    20 Cal. App. 4th 801 (1993).......................................................45

*Howard v. Everex Sys.,*
    228 F. 3d 1057 (9th Cir. 2000)..................................................39

*Hudson v. Sherwood Sec. Corp.,*
    No. C-86-20344-WAI, 1987 U.S. Dist. LEXIS 16019
    (N.D. Cal. Nov. 5, 1987).............................................................30

*IDS Bond Fund, Inc. v. Gleacher NatWest Inc.,*
    No. 99-116 (MJD/JGL), 2002 U.S. Dist. LEXIS 4073
    (D. Minn. Mar. 6, 2002)...............................................................41

*In re Able Labs. Sec. Litig.,*
    No. 05-2681 (JAG), 2008 U.S. Dist. LEXIS 23538
    (D.N.J. Mar. 24, 2008)..........................................................23, 25

*In re Activision Sec. Litig.,*
    621 F. Supp. 415 (N.D. Cal. 1985)...........................................30

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,*
    No. 03 MD 1529 (LMM), 2005 U.S. Dist. LEXIS 14444
    (S.D.N.Y. July 18, 2005).............................................................25

*In re Countrywide Fin. Corp. Sec. Litig.,*
    588 F. Supp. 2d 1132 (C.D. Cal. 2008).....................................21

*In re Enron Corp. Sec. Litig.,*
    No. H-01-3624, 2005 U.S. Dist. LEXIS 39927
    (S.D. Tex. Dec. 5, 2005)........................................................32, 34

*In re GlenFed Inc. Sec. Litig.,*
    42 F.3d 1541 (9th Cir. 1994)......................................................21

*In re Maxim Integrated Prods.,*
    574 F. Supp. 2d 1046 (N.D. Cal. 2008).....................................38

*In re LDK Solar Secs. Litig.,*
    No. C07-05182 WHA, 2008 U.S. Dist. LEXIS 80717
    (N.D. Cal. Sept. 24, 2008)..........................................................39

iv

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

*In re Nat'l Century Fin. Enters., Inv. Litig.*,
   504 F. Supp. 2d 287 (S.D. Ohio 2007)……………………………………………………40

*In re Nat'l Century Fin. Enters.*,
   541 F. Supp. 2d 986 (S.D. Ohio 2007)…………………………………………28, 41

*In re Software Toolworks Sec. Litig.*,
   50 F. 3d 615 (9th Cir. 1995)……………………………………………………………31

*In re Stone & Webster, Inc. Sec. Litig.*,
   No. 00-10874-RWZ, 2006 U.S. Dist. LEXIS 42061
   (D.Mass.June 23, 2006)…………………………………………………………………25

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
   No. 02-1335-B, 2007 U.S. Dist. LEXIS 42401
   (D.N.H. June 11, 2007)…………………………………………………………………23

*In re Wash. Mut., Inc. Sec. Litig.* ("WaMu I"),
   259 F.R.D. 490 (W.D. Wash. 2009)………………………………………………passim

*In re Wash. Mut., Inc. Sec. Litig.* ("WaMu II"),
   2:09-md-1919 MJP, 2009 U.S. Dist. LEXIS 99727
   (W.D. Wash., Oct.27, 2009)………………………………………………………passim

*In re Victor Techs. Sec. Litig.*,
   102 F.R.D. 53 (N.D. Cal. 1984)…………………………………………………………29

*In re Zoran Corp. Derivative Litig.*,
   511 F. Supp. 2d 986 (N.D. Cal. 2007)…………………………………………………38

*Kendrick v. Schwartz*,
   69 Cal. App. 2d 171 (1945)……………………………………………………………45

*Landmark Screens LLC v. Morgan, Lewis & Bockius LLP*,
   No. C08-2581 JF (HRL), 2008 U.S. Dist. LEXIS 87646
   (N.D. Cal. Oct. 2, 2008)…………………………………………………………………43

*Luminent Mortgage Capital Inc. v. Merrill Lynch & Co.*,
   652 F. Supp. 2d 576 (E.D. Pa. 2009)…………………………………………………46

*Mirkin v. Wasserman*,
   5 Cal. 4th 1082 (1993)…………………………………………………………………36

*M&T Bank Corp. v. Gemstone CDO VII, Ltd.*,
   891 N.Y.S. 2d 578 (N.Y. App. Div. 2009)…………………………………………41, 42

*Musick, Peeler & Garrett v. Employers Ins.*,
   508 U.S. 286 (1993)……………………………………………………………………25

*Neubronner v. Milken*,
   6 F.3d 666 (9th Cir. 1993)………………………………………………………………38

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am West*,
   320 F.3d 920 (9th Cir. 2003)……………………………………………………………24

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

*Northwestern Mut. Life Ins. Co. v. Banc of Am. Sec. LLC.,*
 254 F. Supp. 2d 390 (S.D.N.Y. 2003)...........................................................................33, 42

*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.,*
 157 Cal. App. 4th 835 (2007)...................................................................................41

*Openwave Sys. v. Fuld,*
 No. C08-5683 SI, 2009 U.S. Dist. LEXIS 48206
 (N.D. Cal. June 6, 2009)........................................................................................28

*Parvin v. Davis Oil Co.,*
 524 F.2d 112 (9th Cir. 1975)...................................................................................29

*Phelps v. A.L. Jameson & Co.,*
 6 Cal. App. 2d 546 (1935)......................................................................................44

*Platt Elec. Supply, Inc. v. EOFF Elec., Inc.,*
 522 F. 3d 1049 (9th Cir. 2008)................................................................................42

*Reese v. Malone,*
 No. C08-1008 MJP, 2009 U.S. Dist. LEXIS 15774
 (W.D Wash. Feb. 27, 2009).....................................................................................26

*Ross v. A.H. Robins Co.,*
 607 F.2d 545 (2d Cir. 1979)....................................................................................25

*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.,*
 88 Cal. App. 4th 439 (2001)...................................................................................44

*Small v. Fritz Cos.,*
 30 Cal. 4th 167 (2003)..........................................................................................37

*StorMedia Inc. v. Superior Court,*
 20 Cal. 4th 449 (Cal. 1999)...................................................................................36

*Teachers' Sys. of La. v. Qwest Commc'ns Int'l Inc.,*
 No.04-0782-REB-CBS, 2005 U.S. Dist. LEXIS 44756
 (D. Colo. Sept. 23, 2005).......................................................................................25

*Walker v. Signal Cos., Inc,*
 84 Cal. App. 3d 982 (1978)....................................................................................44

*Wojtunik v. Kealy,*
 394 F. Supp. 2d (D. Ariz. 2005)..............................................................................39

*Wright v. Selle,*
 811 N.Y.S. 2d 525 (4th Dep't 2006).........................................................................42

*Zinn v. Ex-Cell-O Corp.*
 24 Cal. 2d 290 (1944)..........................................................................................45

vi

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

# STATUTES, RULES AND REGULATIONS

15 U.S.C.
     §78r(a)................................................................................................23
     §78 r(c)...............................................................................................24

28 U.S.C.
     §1658(b)..............................................................................................25

17 C.F.R.
     §230.144A...........................................................................................33
     §230.405.............................................................................................24

California Civil Code
     §1668.................................................................................................41
     §1709.................................................................................................37
     §1710.................................................................................................37
     §1710(2).............................................................................................37
     §3333.................................................................................................44

California Corporations Code
     §25008...............................................................................................29
     §25400(d)......................................................................................32, 35
     §25401.........................................................................................27, 32
     §25500.........................................................................................32, 35
     §25501.......................................................................27, 31, 32, 33, 35, 44
     §25504.1.............................................................................................35
     §25701...............................................................................................41

Federal Rules of Civil Procedure
     Rule 8(a)(2).........................................................................................21
     Rule 9(b)........................................................................................21, 43
     Rule 15(a)...........................................................................................47

California Civil Jury Instructions
     I-1900 CACI 1923................................................................................44
     I-1900 CACI 1924................................................................................44

# SECONDARY AUTHORITY

5 B.E. Witkin, Summary of California Law: Torts (9th ed. 1988)
     §721.................................................................................................44

H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N 679...........................22

148 Cong. Rec. S 7418 (daily ed. July 26, 2002)......................................................26

Pub. L. 107-204, Title VIII,
     §804, 116 Stat. 745...............................................................................26

Keith Paul Bishop, *California's Blue Sky Law Problems for Foreign Issues and Foreign Issuers,*
     *Insights,* July 2009...............................................................................29

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.:  (760) 579-7368 Fax: (760) 579-7369

Robert J. Haft, *Due Diligence in Securities Transactions*
    West Group 1999-2001………………………………………………………..33

Lloyd S. Harmetz, *Frequently Asked Questions About Rule 144A*
    Morrison & Foerster LLP (2009)………………………………………………..34

Harold Marsh, Jr. & Robert H. Volk,
*Practice Under the California Securities Laws* (2009)....................................27, 29, 31, 32

viii

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS          Dietrich Siben Thorpe LLP
No. 2:08-md-1919 MJP          2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
No. C09-1756 MJP          Tel.: (760) 579-7368 Fax: (760) 579-7369

1  Plaintiffs, Flaherty & Crumrine Preferred Income Fund Incorporated, Flaherty & Crumrine

2  Preferred Income Opportunity Fund Incorporated, Flaherty & Crumrine/Claymore Preferred Securities

3  Income Fund Incorporated, Flaherty & Crumrine/Claymore Total Return Fund Incorporated, and

4  Flaherty & Crumrine Investment Grade Fixed Income Fund (collectively, "Flaherty & Crumrine" or

5  "F&C"), respectfully submit this Consolidated Opposition to Defendants' Motions to Dismiss the

6  Amended Complaint.[1]  For the reasons set forth herein, the Court should deny Defendants' motions.[2]

7  ## I.   __INTRODUCTION__

8  Flaherty & Crumrine seeks redress for injuries suffered as a result of the collapse of Washington

9  Mutual, Inc. (referred to herein, along with its subsidiaries, as "Washington Mutual" or WaMu") – the

10  largest bank failure in United States history.   F&C purchased Washington Mutual unregistered

11  preferred securities that are now essentially worthless.   In purchasing the securities, F&C relied upon

12  many of the same false and misleading statements held to be actionable in the related class case.

13  However, the class case does not cover claims in connection with the purchase of unregistered

14  Washington Mutual securities.  Therefore, F&C initiated the current individual action and asserts two

15  distinct sets of claims: 1) negligence claims (against all Defendants); and 2) fraud–based claims (only

16  against the Officer Defendants).

17  Unable to attack the sufficiency of the substantive factual allegations leveled against them,

18  Defendants argue that F&C failed to plead basic elements of its claims; however, Defendants simply

19  ignore the allegations in the Amended Complaint.

20

21  [1]  "Defendants" refers to: Kerry K. Killinger, Thomas W. Casey, Stephen J. Rotella, Ronald J. Cathcart, David C. Schneider (collectively referred to as the "Officer Defendants"); Anne V. Farrell, Stephen E.

22  Frank, Thomas C. Leppert, Charles M. Lillis, Phillip D. Matthews, Regina Montoya, Michael K. Murphy, Margaret Osmer McQuade, Mary E. Pugh, William G. Reed, Jr., Orin C. Smith, James H.

23  Stever, Willis B. Wood, Jr. (collectively referred to as the "Director Defendants" and together with the Officer Defendants, collectively referred to as the "Individual Defendants"); and Goldman, Sachs &

24  Co., Credit Suisse Securities (USA) LLC, and Morgan Stanley & Co. (collectively referred to as the "Initial Purchaser Defendants").

25  [2]  In order to streamline the current action and preserve judicial resources, F&C agrees to voluntarily

26  dismiss without prejudice its claims for constructive fraud pursuant to Cal. Civ. Code §1573 in Count II, Count III (negligence), Count IV (common law aiding and abetting), and its claims for violations of

27  Cal. Corp. Code §25504 in Count VI.

28

1  For instance, Defendants move to dismiss F&C's fraud and negligent misrepresentation claims

2  by asserting that F&C did not plead reliance on any of the alleged false and misleading statements.

3  Contrary to this argument, F&C alleges actual detrimental reliance.  *See infra* §V.A & C.

4  Unsurprisingly, F&C – a "sophisticated" institutional investor – actually read the false and misleading

5  statements at issue and adequately pleaded that it relied on them when making investment decisions.

6  Instead of arguing a lack of actual reliance, the Initial Purchaser Defendants assert that

7  boilerplate "disclaimers" in the offering documents demonstrate the Initial Purchaser Defendants did

8  not make the statements contained in the Offering Circulars, thereby negating any justifiable reliance

9  and requiring the Court to dismiss F&C's negligent misrepresentation claim under California law.  The

10  Initial Purchasers' argument ignores F&C's well-pleaded allegations that the Initial Purchaser

11  Defendants did in fact make these statements; and, the Initial Purchasers' argument is contrary to the

12  great weight of authority analyzing such boilerplate disclaimers.  Further, California law specifically

13  rejects attempts to limit liability in the manner attempted by the Initial Purchaser Defendants. *See infra*

14  §V.C.2.b.

15  Goldman Sachs seeks to dismiss California securities law claims analogous to §12(a)(2) claims

16  under the Securities Act of 1933, which this Court has already upheld in the consolidated securities

17  class action.  Goldman Sachs' affirmative defense, that it conducted a reasonable investigation, is not

18  suited for determination on a motion to dismiss and is clearly contradicted by the well-pleaded

19  allegations of rampant "red flags" indicating the statements in the Offering Circulars were false and

20  misleading.  *See infra* §V.B.1.b.  Moreover, Goldman Sachs asserts *ipse dixit* – and contrary to the

21  well-pleaded allegations – that the securities F&C purchased were not offered or sold in California.

22  Goldman Sachs posits an incorrect ***factual*** argument, contrary to the well-pleaded allegations that all

23  of F&C's investment decisions and trade activity were conducted through F&C's California

24  headquarters and the Initial Purchaser Defendants solicited F&C in California to participate in the

25  offerings.  *See infra* §V.B.1.a.

26  Finally, the Initial Purchaser Defendants go so far as to claim that F&C's action must be

27  dismissed because it alleges no economic loss.  Incredibly, the Initial Purchaser Defendants argue that

28

2

1   F&C suffered no damages because it received all dividend payments until Washington Mutual fell into

2   bankruptcy – essentially asserting that the securities had no independent worth, but for the value of

3   their distributions.  Not only is this argument contradicted by the fact that the securities were purchased

4   for valuable consideration, and are now worth virtually nothing, but California law delineates the scope

5   of allowable damages under both the common law and its securities code to include recovery based on

6   purchase price inflation, which F&C alleges in connection with its claims against the Initial Purchaser

7   Defendants.  *See infra* §V.D.

8          In sum, Defendants' arguments in favor of dismissal are contrary to F&C's well-pleaded facts,

9   contradict applicable federal and state law, and are inconsistent with this Court's prior holdings.

10  Therefore, F&C respectfully requests that the Court deny Defendants' motions.

11         **II.    PROCEDURAL HISTORY**

12         On May 7, 2008, the Court consolidated three related securities class actions as part of a Multi-

13  District Litigation proceeding against Defendants.  Defendants filed their first round of motions to

14  dismiss on December 8, 2008, and the Court heard argument on these motions on May 1, 2009.  On

15  May 15, 2009, the Court dismissed claims pursuant to §§10(b) and 20(a) of the Exchange Act of 1934

16  without prejudice and granted in part and denied in part claims pursuant to §§11, 12, and 15 of the

17  Securities Act of 1933.  The class action plaintiffs alleged actionable misrepresentations concerning

18  underwriting standards, internal controls, and reserves for anticipated loan losses.  *In re Wash. Mut.,*

19  *Inc. Sec. Litig.*, 259 F.R.D. 490, 497-501 (W.D. Wash. 2009) ("*WaMu I*").

20         Specifically, the class plaintiffs alleged that the October 2007 public offering documents

21  represented that "'The Company … ensure[s] compliance with its underwriting standards'" to mitigate

22  and manage credit risk. *Id.* at 505.[3]  Class plaintiffs asserted that this statement was "'materially false

23  and misleading because the Company was, in fact, lowering its underwriting standards and issuing

24  loans that were increasingly unlikely to be repaid.'"  *Id*.  Class plaintiffs alleged that WaMu employed

25

26  _____

    [3]  All internal citations and quotations are omitted, and all emphasis has been added, unless otherwise
27  noted.

28                                          3

1   "'extremely loose underwriting guidelines'" to which it "'routinely allowed exceptions.'" *Id*.  The class

2   plaintiffs further asserted that exceptions to the underwriting guidelines were "'part of the norm'" and

3   "'[t]here were really no restrictions to approve a loan.'" *Id*.

4          The Court found that these allegations contradicted WaMu's representation that it was

5   mitigating credit risk through compliance with its underwriting standards, and indicated that WaMu

6   was instead increasing credit risk by loosening and ignoring its underwriting standards.  *Id*.  Therefore,

7   the Court held that the class plaintiffs' allegations sufficiently "'set forth what is false or misleading

8   about [the] statement, and why it is false'" reasoning that if WaMu's lending environment was fraught

9   with such extreme departure from any plausible conception of "'standards,'" a statement that the

10   Company followed underwriting standards to manage or mitigate credit risk would mislead a reasonable

11   investor.  *Id*. at 505-06.

12          Similarly, the class plaintiffs alleged that the October 2007 public offering documents falsely

13   represented that: (1) "'[M]anagement believes that … the Company maintained effective internal

14   control over financial reporting[;]'" and (2) "'Management reviews and evaluates the design and

15   effectiveness of the Company's internal control over financial reporting on an ongoing basis … and

16   changes its internal control over financial reporting as needed to maintain their effectiveness,

17   correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's

18   internal controls.'"  *Id*. at 506.  Further, the class plaintiffs alleged that Defendants misrepresented in

19   the October 2007 public offering documents that WaMu periodically adjusted its internal controls to

20   maintain their effectiveness.  *Id*.  The class plaintiffs alleged these statements to be false because the

21   Company's Loan Performance Risk Model ("LPRM"), "the key model used by the Company to predict

22   losses,'" failed to account for the high credit risk presented by WaMu's Option ARM loans and other

23   loans allowing for negative amortization.  *Id*.  According to the class plaintiffs, "'as of summer 2007,

24   the LPRM had not been calibrated to reflect actual loan performance data for over ***eighteen months***.'"

25   *Id*. (emphasis in original).   In addition, class plaintiffs contended that Defendants intentionally

26   decreased the effectiveness of WaMu's risk management group during the Class Period, assigning risk

27   management personnel a "'secondary "support" role to loan production[.]'" *Id*.  In removing controls

28                                                                4

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.:  (760) 579-7368 Fax: (760) 579-7369

1    against risky lending, WaMu allowed a single officer to occupy two roles with conflicting purposes, as

2    the supervisor of both the risk management personnel and the home lending operations.  *Id.*

3           The Court held that these allegations explained with particularity why the alleged

4    misrepresentation concerning internal controls in WaMu's October 2007 public offering documents

5    were both false and misleading.  WaMu's representation that it continually updated its internal controls

6    to maintain their effectiveness was specifically contradicted by allegations that the Company

7    intentionally decreased the regulatory power of the risk management group during the Class Period and

8    failed to update its systems for predicting credit risk.  Therefore, the Court held that the class plaintiffs

9    stated a claim under §§11 and 12(a)(2) against all Securities Act Defendants as to the October 2007

10   public securities offering.  *Id.*

11          On October 16, 2009, F&C filed this action in the Superior Court of the State of California,

12   County of Los Angeles.

13          On October 27, 2009, the Court issued an order on Defendants' renewed motions to dismiss. *In*

14   *re Wash. Mut., Inc. Sec. Litig.*, 2:09-md-1919 MJP, 2009 U.S. Dist. LEXIS 99727 (W.D. Wash., Oct.

15   27, 2009) ("*WaMu II*").  The Court concluded that class plaintiffs remedied most of the deficiencies of

16   their initial complaint.  *Id.* at *17-*53.  As to Defendant Killinger, the Court concluded nearly all of the

17   §10(b) claims were adequately pleaded regarding false statements concerning risk management,

18   appraisals, underwriting, financial statements, and internal controls, except for two statements.  *Id.*

19   Concerning Defendants Casey, Rotella, Cathcart, and Schneider, the Court held that the class

20   plaintiffs' §10(b) claims were adequately pleaded as to all five areas of false statements, and, in large

21   part, denied Defendants' motions to dismiss.  *Id.*

22           On November 2, 2009, Defendants removed this action to the U.S. District Court for the Central

23   District of California.  On December 12, 2009, the Judicial Panel on Multidistrict Litigation issued an

24   order transferring the case to this Court.  F&C filed their Amended Complaint on January 25, 2010,

25   which Defendants now seek to dismiss.

26   ///

27   ///

28

1    III.    **STATEMENT OF FACTS**

2         A.    **Summary of the Action**

3         F&C purchased unregistered Washington Mutual Preferred Funding Trust I Fixed-to Floating

4    Rate Perpetual Non-cumulative Trust Securities ("Preferred Trust Securities") issued on March 7, 2006

5    (the "2006 Offering") and October 25, 2007 (the "2007 Offering"), pursuant to the offering documents

6    F&C received from Defendants (the "Offering Circulars"), which also expressly incorporated by

7    reference additional statements made in, among other things, Washington Mutual's filings with the

8    United States Securities and Exchange Commission ("SEC").  ¶¶1, 4, 24.[4]

9         The Offering Circulars and incorporated documents misrepresented critical elements of

10   Washington Mutual's business practices and financial condition, which had a material impact upon

11   Washington Mutual's creditworthiness and the suitability of Plaintiffs' investment in the Preferred

12   Trust Securities.  ¶6.  F&C read and relied upon the Offering Circulars and the documents incorporated

13   by reference, as well as analyst reports and credit ratings agency reports concerning Washington

14   Mutual that repeated and/or relied upon Defendants' false and misleading statements.  ¶¶4, 24.

15        F&C was damaged by Defendants' fraud (Count I against the Officer Defendants ¶¶245-52),

16   violations of California's civil and securities laws (Counts II, V and VI against the Officer Defendants

17   ¶¶253-60, 274-80, and 281-86; and Count VI against Goldman Sachs, ¶¶281-86), negligent

18   misrepresentations (Count IV against all Defendants, ¶¶266-73) and violations of the federal securities

19   laws (Counts VIII and X against the Officer Defendants, ¶¶292-300, and 310-17; Count IX against the

20   Officer and Director Defendants,  ¶¶301-09; and Count XI against the Director Defendants, ¶¶318-24).

21        B.    **WaMu Disregarded Prudent Underwriting and Appraisal Practices**

22        Loans originated by WaMu were retained by the Company as an investment, securitized, or sold

23   to third-party investors.  ¶53. When WaMu sold or securitized loans, WaMu provided purchasers of its

24   mortgage loans with representations and warranties regarding the underwriting and appraisal standards

25   the Company followed in originating the loans.  ¶55.  Compliance with underwriting and appraisal

26   _____

27   [4] All "¶__" and "¶¶__" references are to the Amended Complaint, unless otherwise noted.

28
                                                        6

1   standards, and the credit quality of the loans WaMu originated, were critically important to the

2   Company's financial condition because WaMu was obligated to repurchase or otherwise compensate

3   purchasers of loans originated by WaMu that suffered an early default or that did not comply with

4   stated underwriting and appraisal standards.  ¶56.

5        Beginning in 2003, WaMu's senior executives, including the Officer Defendants, crafted a

6   radical new business strategy that was intended to boost profits.  The new WaMu used huge sales

7   commissions and misleading marketing to push risky and overpriced loans to borrowers. ¶58.

8   According to WaMu's former employees, the scheme to inflate loan volume was directed by WaMu's

9   senior management.  ¶¶61, 71, 72.  "'[P]ressure to keep lending emanated from the top, where

10  executives profited from the swift expansion [including] Kerry K. Killinger, who was WaMu's chief

11  executive from 1990 until he was forced out in September [2008].'"  ¶¶26, 71.  According to a former

12  WaMu senior risk manager, WaMu began approving as many loans as it could.  "'Everything was

13  refocused on loan volume, loan volume, loan volume.'"  ¶62.  As set forth in the accounts of numerous

14  former WaMu employees, WaMu lenders and underwriters "'felt pressure to sell as many loans as

15  possible and push risky but lucrative loans onto all borrowers.'"  ¶60.  Interviews with two dozen

16  former employees, mortgage brokers, real estate agents and appraisers also revealed the relentless

17  pressure to churn out loans which caused bank's meteoric rise and its precipitous collapse in the

18  biggest bank failure in American history.  ¶68.

19       According to former WaMu employees, by no later than 2005 WaMu had abandoned

20  appropriate and customary underwriting standards in order to artificially inflate loan volume.  ¶66.

21  WaMu pressed sales agents to pump out loans while disregarding borrowers' incomes and assets,

22  according to former employees. *Id*.  Similarly, WaMu pressured appraisers to provide inflated property

23  values that made loans appear less risky, enabling Wall Street to bundle them more easily for sale to

24  investors.  *Id*.  According to a founder of an appraisal company that did business with WaMu until

25  2007, "'It was the Wild West … [i]f you were alive, they would give you a loan.  Actually, I think if

26  you were dead, they would still give you a loan.'"  ¶69.

27  ///

28  

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS          Dietrich Siben Thorpe LLP
No. 2:08-md-1919 MJP                                    2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
No. C09-1756 MJP                                        Tel.: (760) 579-7368 Fax: (760) 579-7369

1          **C.**          **False and Misleading Assurances to Investors Prior to the 2006 Offering**

2          Although WaMu had abandoned all prudent underwriting standards by no later than 2005

3  (¶¶59-78) on March 14, 2005, Defendants Killinger, Casey, Farrell, Frank, Matthews, Murphy, Osmer

4  McQuade, Pugh, Reed, Stever, and Wood, told investors in WaMu's Form 10-K for the quarter and

5  year ended December 31, 2004, that WaMu utilized underwriting procedures to mitigate loan losses in

6  its subprime loan portfolio: "'We seek to mitigate the credit risk in this portfolio by re-underwriting all

7  purchased subprime loans.'"  ¶¶143, 144.

8          About six months later, on October 19, 2005, WaMu issued a press release announcing its

9  financial results for the quarter ended September 30, 2005.  This press release was expressly

10 incorporated by reference into the 2006 Offering Circular, dated February 24, 2006 ("2006 Offering

11 Circular").  ¶147. In this press release, WaMu "'announced third quarter 2005 net income of $821

12 million, or $0.92 per diluted share, up 21 percent on a per share basis when compared with net income

13 of $674 million, or $0.76 per diluted share, in the third quarter of 2004.'"  *Id*.  These financial results

14 were false.  Generally Accepted Accounting Principles ("GAAP") required WaMu, including the

15 Officer Defendants and the Director Defendants on WaMu's audit committee, to establish a reserve for

16 incurred credit losses resulting from borrowers defaulting on their obligations to make monthly

17 mortgage payments or when it was probable that borrowers would do so (the "Allowance for Loan and

18 Lease Losses" or "Allowance").  ¶93.  WaMu and the Officer and Director Defendants on the audit

19 committee understated the Allowance by not properly taking into consideration the deteriorating credit

20 quality of the Company's loan portfolio resulting from the abandonment of appropriate underwriting

21 and appraisal practices.  By doing so, the Officer Defendants, the Director Defendants on the audit

22 committee and WaMu overstated WaMu's net income and earnings per share. ¶96.

23          In the same press release, Defendant Killinger characterized the Company's performance as

24 "'solid'" and lauded the Company's "'continued focus'" on risk management.  ¶147.  On that same day,

25 during a conference call with investors, WaMu Chief Executive Officer Killinger declared, "'we

26 believe we can effectively manage our credit quality by continuing to be disciplined and vigilant in our

27 underwriting standards, our portfolio management, and our reserving methodology.'"  ¶148.  WaMu

28

1   Chief Financial Officer Casey claimed: "'Our credit performance continues [to be] very good. … We

2   continue to proactively manage our credit risk, and are taking steps now to reduce potential future

3   exposure.'" *Id*. They knew these statements were false because the Officer Defendants received a

4   September 2005 confidential Corporate Risk Oversight Report which identified deficiencies in WaMu's

5   internal controls and computer modeling that the Company never properly addressed. ¶63. According

6   to the "Corporate Risk Oversight Report," WaMu's own risk management team found that the future

7   performance of popular loans like Option Adjustable Rate Mortgages ("ARMs") was "untested" and

8   created "major and growing risk factors in our portfolio." ¶63.

9        By no later than Fall 2005, WaMu senior executives, including the Officer Defendants,

10  actively discouraged WaMu's risk managers from performing their responsibilities, purposefully

11  dissuading risk managers from raising meaningful issues or negative findings. ¶65. Shortly thereafter,

12  in the Fall of 2005, WaMu's chief compliance and risk-oversight officer made it clear that "'[t]hey

13  weren't going to have risk management get in the way of what they wanted to do, which was basically

14  lend the customers more money,'" according to Dale George, a senior credit-risk officer. ¶64. Despite

15  this knowledge, on November 15, 2005, Defendant Killinger told attendees of WaMu's Investor Day

16  conference: "'On credit risk. We have excellent processes, policies, underwritings, standards and

17  reserving methodologies in place and they have served us very well for quite some time.'" ¶155. And

18  Defendant Schneider lied when he said that "'In addition, we've maintained effective risk

19  management processes. This is clearly a top priority for us. We've invested a significant amount in

20  terms of talent and technology in building risk management[.]'" ¶156.

21              **D.    The False and Misleading 2006 Offering Documents**

22       Goldman Sachs, Credit Suisse and Morgan Stanley sold $1.25 billion of the Preferred Trust

23  Securities to investors, including F&C, by means of the false and misleading 2006 Offering Circular.

24  ¶163. The Initial Purchaser Defendants collectively participated in the review and drafting of the

25  Offering Circulars, approved the final Offering Circulars, solicited sales of the Offerings, and

26  identified themselves as the initial purchasers for the Offerings. The Offering Circulars further

27  identified Goldman Sachs as the Sole Structuring Coordinator and Bookrunner, *i.e.*, the leader of the

28

9

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS          Dietrich Siben Thorpe LLP
No. 2:08-md-1919 MJP                                    2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
No. C09-1756 MJP                                        Tel.: (760) 579-7368 Fax: (760) 579-7369

1   initial purchaser syndicate.  ¶115.  The Initial Purchasers purchased the Preferred Trust Securities

2   from WaMu for resale to investors, including F&C.  The Initial Purchasers entered into a "'firm

3   commitment'" underwriting agreement with WaMu; the Initial Purchasers were obligated to purchase

4   all of the Preferred Trust Securities if they purchased any of the Preferred Trust Securities.  ¶116.

5      The 2006 Offering Circular, which incorporated by reference the false and misleading

6   statements set forth in the Form 10-K for the year ended December 31, 2004, the press release issued on

7   October 19, 2005, the Form 10-Q for the quarter ending September 30, 2005, and the press release

8   issued on January 18, 2006, also contained additional misrepresentations.  ¶¶164-175. For example,

9   Defendants represented that the home equity loans ("HELs" ) "'owned by the Asset Trust were, in all

10   material respects, originated in accordance with the underwriting guidelines of WMB as described in

11   herein.  The HELs have been underwritten by WMB using automated underwriting systems.  WMB's

12   underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing

13   and repayment ability and the value and adequacy of the mortgaged property as collateral.'"  ¶168.

14   Moreover, Defendants explained that "'In evaluating a prospective borrower's ability to repay a HEL,

15   the loan underwriter considers the ratio of the borrower's total monthly debt (including non-housing

16   expenses) to the borrower's gross income (referred to as the 'debt-to-income ratio' or 'back-end ratio.'"

17   *Id*.  In truth, according to former WaMu employees, by no later than 2005 WaMu had abandoned

18   appropriate and customary underwriting standards in order to artificially inflate loan volume.  ¶66.

19   WaMu pressed sales agents to pump out loans while disregarding borrowers' incomes and assets,

20   according to former employees.  *Id*.  By no later than Fall 2005, WaMu senior executives, including the

21   Officer Defendants, actively discouraged WaMu's risk managers from performing their

22   responsibilities, purposefully dissuading risk managers from raising meaningful issues or negative

23   findings.  ¶65.

24      The 2006 Offering Circular also falsely and misleadingly described WaMu's appraisal

25   practices claiming that the adequacy of the property being pledged as collateral generally was

26   determined by an appraisal made in accordance with pre-established appraisal guidelines.  ¶170.  In

27   fact, WaMu pressured appraisers to provide inflated property values that made loans appear less risky,

28

10

1    enabling Wall Street to bundle them more easily for sale to investors.  ¶66.  By 2006, a stunning

2    number of loans at Long Beach Mortgage, the Company's subprime mortgage lender, were quickly

3    going into default.  ¶¶77-78.  Defaults in the first few months of a loan are at least a red flag for fraud.

4    ¶¶77-78.

5            As a result of the Initial Purchasers' experience in the secondary mortgage market, including the

6    2005-2006 underwriting of over $10 billion in securities backed by subprime loans originated by

7    WaMu's wholly owned subsidiary Long Beach Mortgage, WaMu's subprime origination unit, the

8    Initial Purchaser Defendants either knew or were reckless in not knowing that the Offering Circular

9    was false or misleading.  ¶122.  By 2006, a stunning number of loans at Long Beach Mortgage were

10   quickly going into default.  ¶¶77-78.

11           As underwriters of securities backed by billions of dollars of WaMu's loans, the Initial

12   Purchaser Defendants had direct access to extensive, non-public data concerning the credit quality of

13   Washington Mutual's loans.  For example, the Initial Purchaser Defendants had access to all of the

14   underlying loan documents and, as underwriters of the mortgage-backed securities ("MBS"), were

15   obligated to review samplings of the underlying loan documents to ascertain whether the loans were

16   underwritten in accordance with applicable underwriting standards.  ¶123.  And, the Initial Purchaser

17   Defendants had access to quality control reports on statistical sampling tests (referenced in the

18   Offering Circulars), performed by WaMu's credit risk oversight department. ¶124.  Had the Initial

19   Purchaser Defendants conducted a reasonable investigation, including even a cursory review of the

20   loans originated by WaMu, the true, but undisclosed facts, would have been readily apparent to them.

21   ¶119.

22           **E.       False and Misleading Assurances to Investors Prior to the 2007 Offering**

23           On March 15, 2006, WaMu filed with the SEC its Form 10-K for the fourth quarter and fiscal

24   year ended December 31, 2005, amended on August 9, 2006, signed by Defendants Killinger, Casey,

25   Farrell, Frank, Leppert, Lillis, Matthews, Murphy, Osmer McQuade, Pugh, Reed, Smith, Stever, and

26   Wood.  ¶176.  WaMu's 2005 Form 10-K falsely reassured investors of the Company's dedication to

27   appropriate underwriting to safeguard against unwarranted loan losses in its subprime business:  "'The

28

11

1  Company seeks to mitigate the credit risk in this portfolio by ensuring compliance with underwriting

2  standards on loans originated to subprime borrowers and by re-underwriting all purchased subprime

3  loans.'"  *Id*.  In fact, as set forth above, by no later than 2005 WaMu had all but abandoned prudent

4  efforts to ensure compliance with its own underwriting standards.

5      Furthermore, by 2006 WaMu was engaged in a criminal conspiracy to inflate appraisals on

6  loans originated by the Company.  ¶¶79-90.  The scheme to inflate appraisals was discovered by New

7  York State's Attorney General, who unearthed numerous e-mails documenting WaMu's role in the

8  conspiracy. ¶¶86-87.  WaMu's manipulation of appraisal values was not limited to isolated instances

9  but, rather, was a systemic fraud. ¶85.  By fraudulently inflating appraisals, WaMu was able to

10  originate loans that had artificially low loan-to-value ratios ("LTV").  Fraudulently increased appraisals

11  led to decreased LTV ratios, which made the Company's loan portfolios look less risky.  ¶88.

12  Falsifying appraisals also allowed WaMu to do loans that should never have been approved and could

13  not be sold in the secondary market with a proper appraisal.  This increased WaMu's reported loan

14  origination volumes and revenues, inflating WaMu's reported financial results.  ¶89.

15      At the Company's annual Investor Day conference, held on September 6 and 7, 2006, WaMu's

16  executives praised the Company's "'strong underwriting,'" "'conservative lending standards,'"

17  "'rigorous credit standards,'" and "'disciplined credit culture.'"  ¶178.  Specifically, Defendant

18  Cathcart noted:  "'At origination, WaMu focuses on an effective underwriting process and borrower

19  disclosures[.]'"  Hence, "'[w]ith respect to the borrower, the portfolio quality is very sound.'"  *Id*.

20  Cathcart continued:  "'Even after maximum negative amortization and with no home price

21  appreciation, the portfolio should remain well secured and the borrower should have sufficient equity to

22  refinance, should they choose to do so.'"  Defendant Cathcart concluded that, for Option ARM

23  borrowers, "'WaMu controls the underwriting, so we have the opportunity to evaluate the borrower at

24  the time of origination.  Overall, we are comfortable with this portfolio.'"  *Id*.

25      During the Company's Investor Day, the Officer Defendants falsely claimed WaMu was

26  prepared for a weak housing market.  Killinger misleadingly stated:  "'For WaMu, a slowdown in

27  housing will no doubt lead to higher delinquencies and credit cost, and again, we factor that into our

28

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

1   planning. However, as I alluded to earlier, we began planning for this quite some time ago, took a

2   number of defensive actions. And so, I believe that we are very well positioned, regardless of what

3   happens in the housing market.'" ¶179.

4          Defendant Schneider misleadingly assured investors that the Company had "'reserved for

5   [subprime losses] appropriately and we have also, in second quarter of '06, tightened up a number of

6   our underwriting guidelines, and you can see that in our numbers.'" ¶180. Touting his experience

7   through many housing cycles, Rotella stated the Officer Defendants "'[felt] good about the fact that

8   we've been aggressive in controlling what we can control. Frankly, we've been ahead of the market in

9   my perspective.'" Defendant Cathcart misleadingly asserted "'we have been watching our credit

10  profile diligently for the last two years, and we've been making strategic choices to prepare for the

11  environment we currently find ourselves in.'" ¶181.

12         These statements were materially false and misleading because WaMu (i) artificially inflated

13  loan volume by secretly abandoning prudent underwriting standards; (ii) disregarded the warnings of its

14  risk managers and otherwise minimized the role of risk management so as to pursue its undisclosed

15  risky business practices; (iii) artificially inflated appraisal values to close loans that otherwise would not

16  have been done; and (iv) misstated its financial results by not properly provisioning for loan losses that

17  were highly likely to result from the Company's disregard for proper underwriting and fraudulent

18  appraisal manipulations. ¶183. Contrary to WaMu's Form 10-K, WaMu did not ensure compliance

19  with underwriting standards on loans originated to subprime borrowers. *Id*. Contrary to statements

20  made at the investor conference, WaMu's loan quality was not "'very sound'" but rather very risky and

21  the Company had not been making "'strategic choices to prepare for'" a downturn in the housing

22  market. *Id*. Contrary to Defendant Schneider's statements, WaMu was not appropriately reserved for

23  subprime losses and had not meaningfully tightened its underwriting guidelines as the Company

24  continued to issue significant loans in violation of its stated underwriting guidelines. *Id*.

25         On March 1, 2007, WaMu filed with the SEC its Form 10-K for the fourth quarter and fiscal

26  year ended December 31, 2006, which was expressly incorporated by reference in the 2007 Offering

27  Circular. ¶184. Defendants Killinger, Casey, Farrell, Frank, Leppert, Lillis, Matthews, Murphy,

28                                                    13

1   Osmer McQuade, Montoya, Pugh, Reed, Smith, and Stever signed the 2006 Form 10-K.  Defendants

2   Killinger and Casey signed certifications attesting to the accuracy of the information contained in the

3   2006 Form 10-K and the adequacy of the Company's internal controls, substantially similar to the

4   statements in ¶¶151-52.  The 2006 Form 10-K reported WaMu's false and misleading 2006 financial

5   results which were not prepared in accordance with GAAP.  ¶184.

6       In the 2006 Form 10-K, the Company continued to misleadingly emphasize its underwriting and

7   other procedures as a safeguard against incurring unwarranted credit risk.  ¶186.  For example, WaMu

8   stated in the 2006 Form 10-K: "'The Company actively manages the credit risk inherent in its Option

9   ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan

10  performance and conducting risk modeling procedures.'"  *Id*.  Likewise, the 2006 Form 10-K

11  emphasized the Company's underwriting practices for its subprime mortgages, reassuring investors that

12  "'loan application and appraisal packages are reviewed to ensure conformity with the Company's stated

13  credit guidelines. …  Similarly, all purchases from Subprime Lenders must satisfy the Company's

14  stated credit guidelines.'"  ¶186.  In fact, as set forth above, WaMu had abandoned underwriting

15  efforts and did not ensure its subprime loan portfolio consisted of loans originated in conformity with

16  the Company's stated credit guidelines.  Moreover, by February 2007, WaMu was engaged in a

17  criminal conspiracy to manipulate the appraised values of homes acting as collateral for WaMu-

18  originated loans. ¶¶79-90.

19      Despite the fact that on April 17, 2007, eAppraiseIT's President wrote a memorandum to

20  WaMu that WaMu's selection of appraisers "'appears to be directly in contradiction to the interagency

21  guidelines'" promulgated by the Office of Thrift Supervision, Office of the Comptroller of the

22  Currency, and the Federal Deposit Insurance Corporation ("FDIC") (¶87) that same day the Company

23  conducted a conference call with investors and Defendant Killinger stated that the Company was

24  "'seeing encouraging signs with the improvement in the prime business that we saw in the first quarter,

25  and with the steps that we've taken into the subprime area of increasing pricing, improving

26  underwriting, that we are starting to see that show up in the way of early signs of credit on the 2007

27  production looks much better than '06, so that's encouraging.'"  ¶190.  Defendant Casey echoed these

28                                              14

1   false statements by asserting that "'we have significantly increased our pricing and decreased our risk

2   profile that we're willing to underwrite to, and so we think all those factors taken together will make

3   this business a little more profitable.   We are being selective with our underwriting.'"   *Id*.

4   Additionally, Defendant Rotella stated, "'we have absolutely no plans to shut down our subprime

5   channel.  We have, as you've heard, since the beginning of last year been tightening credit in that part

6   of our business.'"   *Id*.

7         On July 18, 2007, WaMu issued a press release announcing its financial results for the quarter

8   ended June 30, 2007.  ¶195.  This press release was expressly incorporated by reference into the 2007

9   Offering Circular.  *Id*.  That same day, the Company held a conference call with investors to discuss the

10   results.   During the call, the Officer Defendants again sought to reassure investors that WaMu was

11   prudent and conservative in its business practices.   ¶196.  For instance, Defendant Killinger stated that

12   WaMu was "'tightening underwriting'" and helping "'lead the industry to what we think is much more

13   prudent and appropriate underwriting standards at this point in the cycle.'"   *Id*.   Further, Defendant

14   Casey stated, "'While we anticipate that we will see higher [nonperforming assets] across all of our

15   home loan portfolios, we expect losses in the prime loans to be much lower due to the lower LTVs and

16   high FICO profile of our prime portfolio.'"   *Id*.

17         On October 17, 2007, WaMu issued a press release announcing its financial results for the

18   quarter ended September 30, 2007.  ¶202.  This press release was expressly incorporated by reference

19   into the 2007 Offering Circular.  *Id*.  In this press release, WaMu announced "'third quarter 2007 net

20   income of $210 million, or $0.23 per diluted share, compared with net income of $748 million, or $0.77

21   per diluted share, in the third quarter of 2006.  The company attributed the decline to a weaker housing

22   market and disruptions in the capital markets.'"   *Id*.  Defendant Killinger misleadingly attributed the

23   Company's lower results to "'the increasingly difficult market conditions that are challenging the

24   banking industry'" without reference to the Company's prior disregard for proper underwriting and

25   appraisal standards.  *Id*.

26         WaMu's earnings as reported in the October 17, 2007 press release were false and misleading

27   and not in compliance with GAAP. ¶203.  WaMu substantially and materially understated the amount

28

15

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

1   of the provision that WaMu was required to record under GAAP to properly reserve for its impending

2   loan losses.  *Id*.  WaMu's Provision and Allowance for Loan and Lease Losses was based on

3   fraudulently manipulated appraisals and therefore did not take into account the true value of the

4   underlying collateral.  Moreover, WaMu's allowance was far too inadequate in light of the true credit

5   profile of its borrowers, many of whom only obtained loans from WaMu because the Company

6   abandoned appropriate underwriting standards.  *Id*.

7           The inadequacy of the Company's allowance began to be revealed when, on November 1, 2007,

8   the New York Attorney General revealed WaMu had falsified appraisals and then again, on December

9   10, 2007, when WaMu was forced to announce it was increasing its allowance provision for the fourth

10   quarter by approximately $400 million and expected to take additional substantial increases throughout

11   2008.  *Id*.

12                **F.**       **The False and Misleading 2007 Offering Documents**

13           Goldman Sachs, Credit Suisse, and Morgan Stanley, along with now-bankrupt Lehman Brothers

14   Inc., sold $1 billion of the 2007 Preferred Trust Securities to investors, including F&C, by means of a

15   false and misleading offering circular, dated October 18, 2007 ("2007 Offering Circular").  ¶204. The

16   2007 Offering Circular incorporated by reference the false and misleading statements set forth in the

17   Form 10-K for the year ending December 31, 2006, the Form 10-Q for the quarter ending March 31,

18   2007, the July 18, 2007 press release, and the Form 10-Q for the quarter ending June 30, 2007.  ¶205.

19   The 2007 Offering Circular falsely and misleadingly described WaMu's underwriting practices:

20           WMB's underwriting guidelines generally are intended to evaluate the
21           prospective borrower's credit standing and repayment ability and the value and
             adequacy of the mortgaged property as collateral. … Prospective borrowers are
22           required to provide details about their financial factors such as their assets, liabilities
             and related monthly expenses, as well as income and employment information.

23           ¶209.

24   In fact, according to former WaMu employees, no later than 2005, WaMu had abandoned appropriate

25   and customary underwriting standards in order to artificially inflate loan volume by disregarding

26   borrowers' incomes and assets.  ¶66.

27

28                                                 16

1     The 2007 Offering Circular also falsely and misleadingly described WaMu's appraisal

2  practices stating that the adequacy of the property being pledged as collateral generally was determined

3  by an appraisal made in accordance with pre-established appraisal guidelines. ¶211. In fact, WaMu

4  was engaged in a criminal conspiracy to manipulate appraisals in contravention of appraisal guidelines

5  and federal regulations. ¶¶79-90.

6     Despite the fact that by no later than Fall 2005, WaMu senior executives, including the Officer

7  Defendants, actively discouraged WaMu's risk managers from performing their responsibilities,

8  purposefully dissuading risk managers from raising meaningful issues or negative findings (¶65), the

9  2007 Offering Circular falsely and misleadingly assured investors that WaMu maintained appropriate

10  credit risk management procedures and policies to monitor the Company's lending practices and loan

11  portfolio and safeguard the Company from incurring unreasonably risky loans from borrowers who

12  could not afford to repay. ¶215. The 2007 Offering Circular misleadingly stated that:

13     The Chief Credit Officer is responsible for overseeing the work of a credit policy
       committee, monitoring the quality of the WMI Group's credit portfolio, determining the
14     reasonableness of the WMI Group's allowance for loan losses, reviewing and approving
       large credit exposures and setting underwriting criteria for credit-related products and
15     programs.  Credit risk management is based on analyzing creditworthiness of the
       borrower, the adequacy of the underlying collateral given current events and conditions
16     and the existence and strength of any guarantor support.

17

18     ¶215.

19     In truth, in the Fall of 2005 and throughout the relevant period prior to the Offerings, WaMu's

20  chief compliance and risk-oversight officer made it clear that  "'[t]hey weren't going to have risk

21  management get in the way of what they wanted to do, which was basically lend the customers more

22  money,'" according to Dale George, a senior credit-risk officer.  ¶64.

23     The Initial Purchaser Defendants were negligent in not discovering the truth concerning

24  WaMu's true financial condition and the credit quality of its loan portfolio. ¶119.  In particular,

25  Goldman Sachs knew or should have known that, among other things, that WaMu's mortgage loans

26  were being carried on WaMu's balance sheet at exceedingly high valuations with improper Allowances

27  for Loan Losses as a result of the significant risk the loans would not be repaid. ¶126. Prior to the 2007

28

17

1   Offering, Goldman Sachs believed WaMu's entire business model was imperiled.  At the same time

2   Goldman Sachs was selling the 2007 Preferred Trust Securities to Plaintiffs – the valuation of which

3   was dependent upon, among other things, Washington Mutual's subprime mortgage loan portfolios

4   and subprime lending business – Goldman Sachs was making billions of dollars by betting against the

5   subprime mortgage market.  ¶130.  In August through October 2007, Goldman Sachs wrote down the

6   valuations of MBSs linked to trades (credit default swaps) with insurer AIG.  In writing down the

7   valuations on the securities linked to the credit default swaps, Goldman Sachs sought collateral calls

8   from AIG of $1.5 billion in August 2007 and $3 billion in October 2007.  ¶136.

9          Thus, at the same time Goldman Sachs was selling to Plaintiffs the 2007 Preferred Trust

10  Securities – the value of which was dependent upon, among other things, the inflated valuations of

11  residential subprime mortgage loans on WaMu's balance sheet– Goldman Sachs was secretly insisting

12  for its own purposes that securities backed by residential subprime mortgage loans were significantly

13  impaired and their valuations had to be written down.  ¶137.  Goldman Sachs' bet against WaMu's

14  business model, and the creditworthiness of the assets underlying WaMu's balance sheet, was made by

15  the most senior executives of Goldman Sachs. ¶¶133, 135.  Despite Goldman Sachs' access to material,

16  non-public information concerning the loans made by WaMu and other mortgage lenders, and

17  Goldman Sachs' strong convictions to bet billions of dollars against the valuations of subprime

18  mortgage securities like those on WaMu's books, Goldman Sachs never conducted a reasonable

19  investigation to correct the false statements in the Offering Circulars provided to F&C.

20          **G.      WaMu Collapses and the Truth Is Revealed**

21          Washington Mutual's true financial condition and business practices began to come to light only

22  days after Defendants completed the 2007 Offering on or about October 25, 2007.  On November 1,

23  New York Attorney General Andrew Cuomo revealed Washington Mutual orchestrated a systemic

24  fraud to illegally inflate appraisals used in its loan origination process.  ¶12. By December 2007, the

25  SEC launched an inquiry into Washington Mutual's public disclosures concerning its lending practices

26  and its accounting for loans.  The SEC investigation was followed up by a criminal investigation, in

27  which a grand jury has been convened.  ¶13.

28

18

1    On December 10, 2007, after the close of the market, WaMu announced alarming changes to its

2  business model and previous practices, which were the foreseeable result of the Company's

3  unsustainable and undisclosed risky lending practices, appraisal fraud and GAAP violations.  ¶223.

4  WaMu was cutting its quarterly dividend from $0.56 per share to $0.15 per share.  WaMu further

5  increased its loan loss provision guidance for the fourth quarter 2007 to $1.5 to $1.6 billion, from $1.1

6  to $1.3 billion, and announced additional substantial increases would result throughout 2008.  *Id.*

7  WaMu also announced it would end its subprime lending business, significantly pull back on its other

8  residential lending business, and incur a $1.6 billion after-tax charge against goodwill associated with

9  its home loans business.  *Id.*

10    As a result of WaMu's disclosures on December 10, 2007, Moody's cut WaMu's credit rating

11  two notches to Baa2 from A3, noting the move was based on "'its view that credit losses from WaMu's

12  mortgage operations will be noticeably higher than previously estimated.'"¶224.  That same day, Fitch

13  Ratings downgraded WaMu to A- from A citing "'worsening asset quality metrics.'"  *Id.*

14    On December 20, 2007, after the market closed, The Wall Street Journal reported that the SEC

15  had launched an inquiry into WaMu's public disclosures of its mortgage lending practices and

16  accounting.  ¶225.  According to The Wall Street Journal, the SEC was investigating whether "'the

17  company properly accounted for its loans in financial disclosures to investors of the company.'"

18  WaMu confirmed the SEC's inquiry.  *Id.*

19    On March 3, 2008, Fitch Ratings downgraded $2.3 billion worth of WaMu subprime mortgage-

20  backed securities.  Fitch based its downgrade on "'the deteriorating performance of [WaMu's

21  mortgage] pools from 2007, 2006 and late 2005 with regard to continued poor loan performance and

22  home price weakness.'"  ¶227.  And on March 7, 2008, Fitch Ratings lowered its ratings on WaMu

23  because of the "'rapid deterioration'" in WaMu's home equity loans portfolio.  ¶229.

24    On March 27, 2008, Lehman Brothers issued an analyst report estimating WaMu would need to

25  take loan loss provisions of $10 billion in 2008 and an additional $5 billion in 2009.  Further, according

26  to Lehman Brothers' analyst, WaMu would report an earnings loss of $2.84 per share for 2008.  WaMu.

27

28

19

1    Lehman Brothers' analyst estimated, would incur $6 billion in charge-offs in 2008 and $7 billion in

2    charge-offs in 2009.  ¶231.

3          On April 8, 2008, WaMu announced a net loss of $1.1 billion, or $1.40 per share, for the first

4    quarter of 2008.  The Company recorded a loan loss provision of $3.5 billion.  ¶232.

5          On April 11, 2008, Goldman Sachs issued an analyst report, recommending that its clients short

6    sell WaMu stock.  Goldman Sachs wrote:  "'The bad news is that our new product-by-product analysis

7    of its mortgage portfolio suggests $17 billion to $23 billion of embedded losses in WaMu's current

8    book of business, of which only $3 billion have been absorbed so far; subsequently, we forecast a

9    $14bn provision charge in 2008.'"  ¶233.  Goldman Sachs further estimated that WaMu may lose $3.30

10   per share in 2008.  Goldman Sachs' recommendation to "'short'" WaMu was a significant revelation to

11   investors.  *Id.*

12         On July 22, 2008, WaMu announced its second quarter 2008 financial results, including that

13   the Company suffered a net loss of $3.3 billion as a result of a significant increase in its loan loss

14   reserves.  This was a loss of $3.34 per share (excluding a one-time earnings reduction customarily made

15   by analysts in assessing GAAP earnings).  WaMu had to take a $5.9 billion loan loss provision in the

16   quarter and had to increase its loan loss reserves by $3.74 billion to $8.46 billion.  WaMu now

17   anticipated cumulative losses in its residential mortgage portfolio to total $19 billion.  ¶235.

18         Throughout September 2008, WaMu's financial condition worsened and the rating agencies

19   downgraded their estimation of its creditworthiness.  On September 25, 2008, the FDIC took control of

20   WaMu and dismissed its senior management.  ¶237.  WaMu was insolvent.  The Company's

21   securities, already significantly depressed, were rendered essentially worthless.  Massive lending losses,

22   exacerbated by insufficient reserves, caused WaMu's collapse, the biggest bank failure in U.S. history.

23   WaMu's collapse was the foreseeable result of WaMu's undisclosed reckless lending practices and

24   improper accounting.  ¶237.

25         Upon seizing WaMu, the FDIC immediately sold off WaMu's assets and bank deposits to the

26   highest bidder which revealed WaMu had significantly inflated the valuations of the residential

27   mortgage loans on its balance sheet and had engaged in excessively risky lending practices.  ¶238.

28
                                                      20

1    On September 26, 2008, as a result of the FDIC's takeover of Washington Mutual Bank and the

2    bankruptcy of Washington Mutual, Inc., Plaintiffs' investments in the Preferred Trust Securities

3    automatically converted into preferred stock of Washington Mutual, Inc., and thereby rendered

4    worthless.  ¶16.

5    **IV.    LEGAL STANDARDS**

6    As this Court previously held in the related securities class action, "[o]n a 12(b)(6) motion to

7    dismiss, the Court must assess the legal feasibility of the Complaint.  Accordingly, the Court accepts

8    Plaintiffs' factual allegations as true and draws all reasonable inferences in Plaintiffs' favor. Dismissal

9    is appropriate only where a complaint fails to allege 'enough facts to state a claim to relief that is

10   plausible on its face.'"  *WaMu I*, 259 F.R.D. at 494-95 (quoting *Bell Atlantic Corp. v. Twombly*, 550

11   U.S. 544, 570 (2007)).

12   Under the notice pleading standards of Rule 8(a) of the Federal Rules of Civil Procedure, a

13   complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*,

14   550 U.S. at 570.[5]  When claims of fraud are alleged, Rule 9(b) requires that "the circumstances

15   constituting fraud or mistake … be stated with particularity."  Fed. R. Civ. P. 9(b).  In meeting the

16   requirements of Rule 9(b), a complaint must contain "particularized allegations of the circumstances

17   constituting fraud," which may include the "time, place, and content of an alleged misrepresentation" in

18   addition to the "circumstances indicating falseness."  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541,

19   1547-48 (9th Cir. 1994).

20   F&C alleges negligence-based causes of action against all Defendants, as well as fraud claims

21   against the Officer Defendants.  All claims against the Officer Defendants "necessarily allege fraudulent

22   conduct and are subject to the heightened pleading requirement of Rule 9(b).  However, because it is

23   

---

24   [5]  Subsequent to the Court's initial motion to dismiss ruling on the class action the Supreme Court
25   decided *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), which discusses the application of Rule 8(a)(2).
     However, as the Court noted in it's second motion to dismiss decision, "*Iqbal* reaffirms the Supreme
26   Court's decision in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)
     and does not alter the standard the Court previously employed to test those claims in the Complaint
27   subject to Rule 8." *WaMu II*, 2009 U.S. Dist. LEXIS 99727, at *7-*8.

28   

| CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS | Dietrich Siben Thorpe LLP |
|---|---|
| No. 2:08-md-1919 MJP | 2173 Salk Avenue, Suite 250, Carlsbad, CA 92008 |
| No. C09-1756 MJP | Tel.: (760) 579-7368 Fax: (760) 579-7369 |

1  possible for a defendant to participate in the dissemination of fraudulent statements without awareness

2  of the actual fraud, Rule 9(b) applies only to those defendants also accused in the underlying fraud."

3  *WaMu I*, 259 F.R.D. at 504 (citing *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1163

4  (C.D. Cal. 2008).  Accordingly, the negligence-based claims asserted against the Director and Initial

5  Purchaser Defendants are not subject to Rule 9(b) scrutiny, and must only meet the notice pleading

6  requirements of Rule 8(a).

7  **V.**    **ARGUMENT**

8  **A.**    **F&C Pleads Violations of the Federal Securities Laws**

9  Congress made it clear that "[t]he overriding purpose of our Nation's securities laws is to protect

10  investors and to maintain confidence in the securities markets, so that our national savings, capital

11  formation and investment may grow for the benefit of all Americans.… *Private securities litigation is*

12  *an indispensable tool with which defrauded investors can recover their losses without having to rely*

13  *upon government action*." H.R. Conf. Rep. No. 104-369, at 31 (1995), *reprinted in* 1995 U.S.C.C.A.N.

14  679, 730.

15  F&C alleges violations of the federal securities laws against the Individual Defendants.  In

16  particular, the Amended Complaint alleges violations of §10(b) of the Securities Exchange Act of 1934

17  against the Officer Defendants, as well as violations of §§20(a) and 18 of the Exchange Act against both

18  the Officer and Director Defendants.

19  **1.**    **The Officer Defendants Violated §10(b);**
          **F&C Relied Upon the Officer Defendants'**
20         **False and Misleading Statements**

21  A complaint states a claim under §10(b) when it alleges "(1) a strong inference of scienter, (2) a

22  material misrepresentation or omission, (3) a connection with the purchase or sale of a security, (4)

23  reliance, (5) economic loss, and (6) loss causation." *WaMu II*, 2009 U.S. Dist. LEXIS 99727, at *15

24  (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).  The Court previously denied the

25  Officer Defendants' motions to dismiss §10(b) claims, holding that plaintiffs in the class action

26  sufficiently alleged false statements made with scienter regarding WaMu's "risk management,

27

28

22

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

1    appraisals, underwriting, financial statements, and internal controls." *WaMu II*, 2009 U.S. Dist. LEXIS

2    99727, at *71.

3         The §10(b) claims asserted by F&C against the Officer Defendants are based upon the same

4    categories of false and misleading statements, and in many instances on the exact statements, upheld in

5    the class action.[6]  Moreover, F&C alleges actual reliance on the false and misleading statements.[7]  *See*

6    ¶24.  This clearly satisfies the elements of a valid §10(b) claim.

7         Nonetheless, the Officer Defendants assert that F&C does not adequately plead actual reliance

8    because it fails to allege "facts showing that [F&C] relied on any of the alleged misstatements." WaMu

9    Officers' Motion to Dismiss Amended Complaint ("OD Mem.") at 5.[8]  This argument is contrary to

10   F&C's allegations and the law.  F&C – "sophisticated" institutional investors, as Defendants have

11   labeled them – actually "read and relied upon the Offering Circulars and the documents incorporated by

12   reference, as well as analyst reports and credit ratings agency reports concerning Washington Mutual

13   that repeated and/or relied upon Defendants' false and misleading statements."  ¶24.  The Officer

14   Defendants simply ignore these allegations.

15         Where, as here, a plaintiff alleges "that the statements were read and relied upon in connection

16   with the purchase of … securities," the actual reliance requirement is satisfied.   *In re Able Labs. Sec.*

17   *Litig.*, No. 05-2681 (JAG), 2008 U.S. Dist. LEXIS 23538, at *96 (D.N.J. Mar. 24, 2008).  Indeed, the

18

---

19   [6]  The Court need not revisit its prior rulings, including its decision to uphold the §10(b) claims alleged
20   in the class action, where here F&C alleges "facts [that] echo the class action lawsuit." *In re Tyco Int'l,*
     *Ltd. Multidistrict Litig.*, No. 02-1335-B, 2007 U.S. Dist. LEXIS 42401, at *9 (D.N.H. June 11, 2007);
21   *see also S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1136 (9th Cir. 2004) (the law of the case
     doctrine "precludes a court from reexamining an issue previously decided by the same court or a higher
22   court in the same case").

23   [7]  In pleading actual reliance, F&C also meets the reliance element required for its claims asserted
     under §18 of the Exchange Act. *See* 15 U.S.C. §78r(a).

24   [8]  The Officer Defendants' reliance upon *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir.
25   2009) is inapposite.  OD Mem. at 5.  In *Desai*, the Ninth Circuit did not rule upon the issue of actual
     reliance, which is alleged here, but rather opined on the issue of presumption of reliance in §10(b) class
26   actions – "[p]recisely to which cases this presumption applies – that is, to misrepresentation, to
     omission, to manipulation cases, or to some combination of the three – is an issue the parties contest on
27   appeal."  573 F.3d 931 at 939.

28                                             23

1   Court previously held (in connection with the reliance element under §11 of the Securities Act of 1933)

2   allegations that a plaintiff acquired securities "'relying upon the statements … shown above to be

3   untrue and/or relying upon the Registration Statements … [were] sufficient under Rule 9 to allege

4   reliance. …" *WaMu II*, 2009 U.S. Dist. LEXIS 99727, at *56.  F&C has more than adequately alleged

5   actual reliance.

### 2.   The Individual Defendants' §20(a) Argument Is Moot

7          A complaint sufficiently states a claim for control person liability under§20(a) of the Exchange

8   Act if it alleges: (1) a primary violation of the securities laws; and (2) that a defendant possessed power

9   or control that directly or indirectly induced a violation of the securities laws.  *See No. 84 Employer-*

10  *Teamster Joint Council Pension Trust Fund v. Am. West*, 320 F.3d 920, 945 (9th Cir. 2003).

11         The Amended Complaint satisfies the first element required of §20(a) by pleading a primary

12  violation of the federal securities laws.  *See supra,* §V.A.1.  Accordingly, because the Individual

13  Defendants only challenged F&C's §20(a) claim with respect to the first element, their motions to

14  dismiss this cause of action should be denied.[9]

### 3.   F&C's §18 Claims Are Not Time-Barred

16         To plead a §18 claim, a plaintiff must allege:  (1) a false or misleading statement or omission;

17  (2) that is material; (3) that is contained in an SEC filing (pursuant to the Exchange Act); and (4) upon

18  which the plaintiff relied in its purchase of securities.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 211

19  n.31 (1976).  F&C alleges each of these elements, and the Individual Defendants concede as much.

20         Despite this, the Individual Defendants assert that F&C's §18 claim is time-barred as a matter of

21  law by the statute of limitations.  OD Mem. at 11-13; Outside Directors' Motion to Dismiss Amended

---

[9]  As to the second element, the SEC has defined "control" to include "thepossession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. §230.405.  The Complaint adequately alleges facts demonstrating that the Individual Defendants were controlling persons vested with the "power to direct" the "management and policies" of  WaMu within the meaning of §20(a), which "'was enacted to expand rather than restrict the scope of liability under the securities laws.'"  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1572 n.17, 1577 (9th Cir. 1990).

24

1    Complaint ("DD Mem.") at 16.  The Individual Defendants misstate the law with respect to the correct

2    limitations period applicable to §18 claims.

3         While the language of §18 states that an action must be brought "within one year after the

4    discovery of the facts constituting the cause of action," 15 U.S.C. §78r(c), under the Sarbanes-Oxley

5    Act of 2002 ("SOX"), Congress extended the statute of limitations to "2 years after discovery of the

6    facts constituting the violation" for any "private right of action that involves a claim of fraud, deceit,

7    manipulation, or contrivance in contravention of a regulatory requirement concerning securities laws."

8    28 U.S.C. §1658(b).

9         As the Supreme Court has explained, §18 "'target[s] the precise dangers that are the focus of

10   §10(b)' and *the intent . . . is the same − 'to deter fraud and manipulative practices in the securities*

11   *markets, and to ensure full disclosure of information material to investment decisions*.'"  *Musick,*

12   *Peeler & Garrett v. Employers Ins.*, 508 U.S. 286, 295-96 (1993).  "[I]n fact the same material

13   misstatement or omission can be the basis for both claims.  Moreover, the only difference between

14   pleading claims under §18 of the Exchange Act and §10(b) of the Exchange Act is that §18 requires that

15   a plaintiff sufficiently pleads reliance but not scienter, while §10(b) requires that a plaintiff sufficiently

16   pleads scienter but not reliance."  *Able Labs.*, 2008 U.S. Dist. LEXIS 23538, at *89.  Indeed, as noted

17   by the Second Circuit almost 30 years ago, "[b]y its terms, §10(b) prohibits a *broader* range of conduct

18   than does §18."  *Ross v. A. H. Robins Co.*, 607 F.2d 545, 552 (2d Cir. 1979).

19        Furthermore, since its passage, Courts have expressly found Sarbanes-Oxley's extended

20   limitations periods apply to §18 claims.  *See Teachers' Sys. of La. v. Qwest Commc'ns. Int'l Inc.*, No.

21   04-0782-REB-CBS, 2005 U.S. Dist. LEXIS 44756, at *7-*8 (D. Colo. Sept. 23, 2005)  (holding that

22   §18 "easily" fell within the parameters of a claim involving "fraud, deceit, manipulation, or

23   contrivance" to which the Sarbanes-Oxley Act's extended limitations periods apply); *In re Adelphia*

24   *Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MD 1529 (LMM), 2005 U.S. Dist. LEXIS 14444, at

25   *20 (S.D.N.Y. July 18, 2005) (holding that §18 claims involve "'fraud, deceit, manipulation, or

26   contrivance'" for purposes of the Sarbanes-Oxley limitations periods); and *In re Stone & Webster, Inc.*

27   *Sec. Litig.*, No. 00-10874-RWZ, 2006 U.S. Dist. LEXIS 42061 (D. Mass. June 23, 2006)(same).  Thus,

28

1  F&C's §18 claim is premised on allegations of fraud, deceit, and contrivance in contravention of

2  regulatory requirements concerning the securities laws, and is subject to the extended two-year

3  limitations period under the SOX.[10]

4      Applying the two-year statute of limitations under SOX, F&C's §18 claim is unquestionably

5  timely because the initial complaint was filed on October 16, 2009, less than two years after the

6  Individual Defendants contend that F&C had notice of the claim based upon the commencement of the

7  New York Attorney General's action on November 1, 2007.  *See* OD Mem. at 11.

8          **B.    F&C Properly Pleads Violations of California's Corporate Securities Law**

9      "California's policy is to protect the public from fraud and deception in securities transactions.

10  The Corporate Securities Law of 1968 was enacted to effectuate this policy by regulating securities

11  ─────────────────────

12  [10]  F&C is aware of the Court's unpublished decision in *Reese v. Malone*, No. C08-1008 MJP, 2009
U.S. Dist. LEXIS 15774 (W.D. Wash. Feb. 27, 2009), holding that "the extended limitations period

13  applies only to causes of action concerning fraud … [and] nothing in the language or history of
Sarbanes-Oxley indicates a clear intent to overrule express limitations period."  *Id*. at *25-*26.  F&C

14  respectfully asserts the current argument to preserve its rights on appeal, as the Ninth Circuit has yet to

15  rule on this issue.  However, a review of the legislative history, and particularly the Conference Report,
confirms that Congress intended SOX to be applied to all private securities causes of action under the

16  Securities Exchange Act of 1934.  Title VIII, which is the section at issue, was authored by Senator
Patrick Leahy who stated that it would apply to "all … existing private causes of action under the

17  various federal securities laws."  148 Cong. Rec. S.7418 (daily ed. July 26, 2002).  Senator Leahy

18  provided a section-by-section analysis of Title VIII Congressional Record, as part of the official
legislative history:

19      Section 804. – Statute of Limitations

20      This provision states that it is not meant to create any new private cause of action, but

21      only ***to govern all the already existing private causes of action under the various
        federal securities laws that have been held to support private causes of action. This
        provision is intended to lengthen any statute of limitations under federal securities***

22      ***law, and to shorten none***.  The section, by its plain terms, applies to any and all cases
        filed after the effective date of the Act, regardless of when the underlying conduct

23      occurred.

24  148 Cong. Rec. S.7418.  Senator Leahy's analysis demonstrates that Congress intended for the extended

25  statute of limitations to apply to all federal securities laws, including §18.  Indeed, the preamble states
that the law was passed "[t]o protect investors by improving the accuracy and reliability of corporate

26  disclosures made pursuant to the securities laws, and for other purposes."  Sarbanes-Oxley Act of
2002, Pub. L. No. 107-204, 116 Stat. 745.  Accordingly, SOX did not seek only to protect against fraud,

27  and §804 should not be read as such.

28                                              26

1 | transactions in California and providing statutory remedies for violations of the Corporations Code, in
2 | addition to those available under common law."  *Hall v. The Superior Court of Orange County*, 150
3 | Cal. App. 3d 411, 417 (1983).

### 1. <u>Goldman Sachs Violated California Corporations Code §§25401/25501</u>

California Corporations Code §25401 provides that:  "It is unlawful for any person to offer or sell a security in [California] or buy or offer to buy a security in [California] by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  Among other things, §25501 provides purchasers with a private right of action.  "Sections 25401 and 25501 differ from common law negligent misrepresentation in that: (1) proof of reliance is not required, (2) although the fact misrepresented or omitted must be 'material,' no proof of causation is required, and (3) plaintiff need not plead defendant's negligence."  *Bowden v. Robinson*, 67 Cal. App. 3d 705, 715-16 (1977).

F&C makes out a *prima facie* case against Goldman Sachs pursuant to §§25401/25501.  ***Goldman Sachs does not dispute that it sold the Preferred Trust Securities to Flaherty & Crumrine pursuant to the Offering Circulars containing false and misleading statements***  Indeed, the Court has already held that similar allegations in the WaMu securities class action sufficiently plead that identical (and substantially similar) statements made by Defendants were false and misleading at the time they were made.  *See supra*, §II.

As §§25401/25501 do not require proof of reliance or loss causation, and the plaintiff need not plead negligence, *Bowden*, 67 Cal. App. 3d at 715-16[11], Goldman Sachs' arguments concerning

---

[11] *See also* Harold Marsh, Jr. & Robert H. Volk, *Practice Under the California Securities Laws* §14.03[3][a] (2009) ("Neither Corp. Code §25401 nor Corp. Code §25501 requires that the plaintiff allege or prove as part of his or her *prima facie* case that the misstatement or omission by the defendant was made intentionally or negligently."); *Id.* at §14.03[6] ("Corp. Code §§25401 and 25501 do not require that the plaintiff establish that he or she relied on the false or misleading statement of the defendant in purchase or selling the securities."); *Id.* at §14.03[7] ("Corp. Code §§25401 and 25501 do

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

1    reliance (Motion to Dismiss Amended Complaint by Defendants Goldman, Sachs & Co., Credit Suisse

2    Securities (USA) LLC, and Morgan Stanley & Co. Incorporated ("IP Mem.") at 16-17), loss

3    causation (*id.* at 23-24) and negligence (*id.* 8-16, 19-20) are irrelevant to this cause of action.

4         F&C pleads all of the requisite elements to state a claim against Goldman Sachs for violating

5    §§25401/25501, and the Amended Complaint provides Goldman Sachs with ample notice of the nature

6    of F&C's claims.  Sections 25401/25501 claims are based in negligence, not fraud, and therefore need

7    not comply with Rule 9(b).  *Openwave Sys. v. Fuld*, No. C08-5683 SI, 2009 U.S. Dist. LEXIS 48206, at

8    *12 (N.D. Cal. June 6, 2009) ("the Court agrees with plaintiff that the first cause of action [under

9    §25401] need ***not*** comply with Rule 9(b)").  As this Court has already held, Rule 9(b) does not apply to

10   claims grounded in negligence that do not sound in fraud.  *See supra*, §IV.  F&C's allegations against

11   Goldman Sachs do not sound in fraud.  ¶¶5, 50.  Even though Rule 9(b) is inapplicable to the

12   §§25401/25501 claims, F&C satisfies Rule 9(b) by pleading the "'the time, place, and content of [each]

13   alleged misrepresentation' in addition to 'the circumstances indicating falseness.'"  *WaMu I*, 259

14   F.R.D. at 503.  *See* ¶¶143-219.

                  a)       **Goldman Offered the Preferred Shares to Flaherty &**
15                               **Crumrine in California; F&C May Avail Itself of**
16                               **California's Investor Protection Statutes**

17        "Typically, a defrauded buyer of a security may assert a blue sky claim under the law of his own

18   state."  *In re Nat'l Century Fin. Enters.*, 541 F. Supp. 2d 986, 1008 (S.D. Ohio 2007).  All of the

19   Plaintiffs purchased through Flaherty & Crumrine Inc.'s California headquarters. ¶24.  F&C pleads a

20   sufficient nexus to California for application of the Corporations Code.

21        Sections 25401/25501 apply to securities ***offered or sold*** in California.  Flaherty & Crumrine

22   purchased the Preferred Trust Securities in California.   ¶24.  Accordingly, F&C is entitled to the

23   protections of §§25401/25501.

24   ///

26   not require that the plaintiff demonstrate any connection between the false or misleading statement and
     the damages suffered by the plaintiff.").

28                                                    28

1          Contrary to the well-pleaded allegations, Goldman Sachs incorrectly argues that F&C purchased

2   the Preferred Trust Securities in New York because the Offering Circulars state "both payment and

3   delivery of the securities would be **completed** in New York." I.P. Mem. at 19.  Whether the transaction

4   was ultimately completed in New York, however, is irrelevant.  Flaherty & Crumrine authorized the

5   purchase and paid for the Preferred Trust Securities from its headquarters in California.  The Ninth

6   Circuit has held:  "As the purpose of the California Securities Laws is to protect investor-residents, we

7   consider that the payment by [the investor] in the form of a check mailed from California, constituted a

8   sale of securities in California. …"  *Parvin v. Davis Oil Co.*, 524 F.2d 112, 117 (9th Cir. 1975) (also

9   holding with regards to a different transaction, "sending of the agreement to [the investor] and his

10  subsequent signing of it in California constitute a sale of securities in California").[12]   Sections

11  25401/25501 are applicable to F&C's purchase of the Preferred Trust Securities.

12         In the alternative, Flaherty & Crumrine may bring claims pursuant to §§25401/25501 not only

13  because F&C purchased the Preferred Trust Securities in California, but also because Goldman Sachs

14  offered the Preferred Trust Securities in California.

15         "Corp. Code §25008 provides that California jurisdiction will attach if any one of the three

16  following elements takes place in the State of California: (1) the offer to sell is made in this state; (2) an

17  offer to buy is accepted in this state; or (3) the security is delivered to the purchaser in this state if both

18  the seller and the purchaser are domiciled in this state." Marsh & Volk, *supra* §3.08[1].  Simply put, as

19  is the case here, §§25401/25501 apply to "*[o]ffers made from outside the state to persons in the state.*"

20  *Id.   See also* Keith Paul Bishop, *California's Blue Sky Law Problems for Foreign Issues and Foreign

21  Issuers*, *Insights*, July 2009 (Thorpe Decl., Ex. A), at 31 ("offers directed from outside the state to

22  persons in California will be subject to the CSL").[13]

23  _____

24  [12] *See also In re Victor Techs. Sec. Litig.*, 102 F.R.D. 53, 60 (N.D. Cal. 1984, *aff'd*, 792 F.2d 862 (9th
    Cir. 1986)) (refusing to certify a nationwide class but holding:  "Of course, … California purchasers …
25  will be entitled to maintain a claim under the California Code [Sections 25500 and 25501]".)

26  [13]  All references to the "Thorpe Decl." refer to the Declaration of David A. Thorpe in Further Support
    of Flaherty & Crumrine Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss the
27  Amended Complaint, filed concurrently herewith.

28                                                      29

1    Sections 25401/25501 apply here as Goldman Sachs directed an offer from outside California to

2  Flaherty & Crumrine in California.  Goldman Sachs' communications were directed to F&C through

3  Flaherty & Crumrine, Inc.'s headquarters and principal place of business in Pasadena, California. ¶24.

4  Goldman Sachs made false and misleading statements concerning the Preferred Trust Securities to

5  F&C (through F&C's California office), upon which Plaintiffs (through F&C's California office) relied

6  when purchasing the Preferred Trust Securities. ¶¶4, 20, 22, 24, 115, 282.

7    Goldman Sachs concedes that F&C properly pleads "that the offering circulars were … directed

8  to Plaintiffs in California" but, according to Goldman, F&C fails to plead that the Offering Circulars

9  were ever "received by Plaintiffs in California." IP Mem. at 18.  Goldman Sachs is being far too literal,

10  and quite misleading.  The Amended Complaint clearly alleges Goldman Sachs sent F&C the Offering

11  Circulars in California, and that F&C read and relied upon the Offering Circulars in California.  This is

12  more than sufficient under §25008.[14]

13    Goldman Sachs asserts that the California's Corporations Code does not apply because the

14  Offering Circulars "state that both payment and delivery of the ***securities*** would be completed in New

15  York."  IP Mem. at 18.  This is a "red herring."  Where the ***securities*** were delivered is irrelevant.

16  Where the transaction closed is irrelevant.  The Corporations Code and case law make it clear that

17  "parties may believe that they can avoid California's jurisdiction by moving the closing out of state.

18  ***This will not work***, however, if the parties already have had communications in California that

19  constitute an offer." Thorpe Decl., Ex. A at 31.  As one noted treatise deals with Goldman Sachs'

20  argument:

21

22

23  [14] Goldman Sachs' authorities are inapposite.  In *Hudson v. Sherwood Sec. Corp.*, No. C-86-20344-WAI, 1987 U.S. Dist. LEXIS 16019, at *16-*18 (N.D. Cal. Nov. 5, 1987), as Goldman Sachs recognizes, "the securities were offered and sold in New York" (IP mem. at 17) whereas here the Preferred Trust Securities were offered in and purchased from California.  In *In re Activision Sec. Litig.*, 621 F. Supp. 415, 431 (N.D. Cal. 1985), the court certified a nation-wide class of investors who (like F&C) purchased in the initial stock offering, but refused to certify a nationwide class of investors who purchased after the initial offering (secondary market purchasers) unless they purchased in California.  F&C purchased in California and in the initial offering, unlike the Activision shareholders denied claims under the California Corporations Code.

28                                                    30

1
2
3
4

> It should be carefully noted that the definition of offer in Corp. Code Section 25017(b),
> … will preclude any evasion of the qualification requirements of the statute by
> transporting the parties across the state border.  Any discussions regarding the proposed
> transaction which have progressed to the point where the parties are ready to [move the
> closing out of California] for the purpose of consummating the transaction will almost
> inevitably have involved an offer in this State.  Hence the jurisdictional requirements
> are already satisfied.

5  Marsh & Volk, *supra* §3.08[4][a].  *See also Eisenbaum v. W. Energy Res.*, 218 Cal. App. 3d 314, 327

6  (communications from seller in Colorado to buyer in California sufficient to establish an offer to buy

7  or sell in California, and any efforts to waive compliance with the Corporations Code void under

8  §25701); *Hall*, 150 Cal. App. 3d at 417-18 (same).

9         Finally, were Goldman Sachs able to avoid the reach of California's securities laws simply by

10  delivering the securities through an intermediary in New York, this would effectively act as a

11  unenforceable choice-of-law provision seeking to evade a California statute and contrary to

12  California's stated public policy interest in protecting the public from fraud and deception in securities

13  transactions.  *See, e.g.*, *Gen. Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1506 (9th

14  Cir. Cal. 1995) (choice of law provision unenforceable if "such application would run contrary to a

15  California public policy or evade a California statute").

16             **b)**     **<u>Goldman Sachs' Reasonable Investigation Defense</u>**

17                      **<u>Raises an Improper Question of Fact</u>**

18         "Neither Corp. Code §25401 nor Corp. Code §25501 requires that the plaintiff allege or prove

19  as part of his or her *prima facie* case that the misstatement or omission by the defendant was made

20  intentionally or negligently." Marsh & Volk, *supra* §14.03[3][a].  *See also Bowden*, 67 Cal. App. 3d at

21  715-16.  As F&C has pleaded a *prima facie* case against Goldman Sachs under §§25401/25501, the

22  Court need not currently consider the question of whether Goldman Sachs was negligent in offering the

23  Preferred Trust Securities.

24         California Corporations Code §25501, which provides Goldman Sachs with an affirmative

25  defense, states in pertinent part:  "Any person who violates Section 25401 shall be liable . . . .,***unless***

26  ***the defendant proves . . . that the defendant exercised reasonable care and did not know (or if he had***

27  ***exercised reasonable care would not have known) of the untruth or omission*.**"  This affirmative

28

---

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

1    defense is taken from §12(a)(2) of the Securities Act.  Marsh & Volk, *supra* §14.03[3][a].  Whether or

2    not Goldman Sachs "exercised reasonable care" – it did not – is a question reserved for a jury and not

3    appropriately addressed by the Court on a motion to dismiss.  *See, e.g., In re Software Toolworks Sec.*

4    *Litig.*, 50 F.3d 615, 621 (9th Cir. 1995) (holding under analogous federal securities law "summary

5    judgment is generally an inappropriate way to decide questions of reasonableness because 'the jury's

6    unique competence in applying the "reasonable man" standard is thought ordinarily to preclude

7    summary judgment'"); Marsh & Volk, *supra* §14.03[3][c] ("Clearly, no mathematical rule can be laid

8    down as to what constitutes reasonable care, since this is a factual question to be determined by the trier

9    of fact in each individual case.").[15]

10    Even though the "reasonable care" defense is a question for the jury, Goldman Sachs

11    erroneously argues that the Court can dismiss Flaherty & Crumrine's §§25401/25501 claims because, as

12    a matter of law and under the circumstances of this offering, Goldman Sachs exercised "reasonable

13    care." IP Mem. at 19-20.  The Court has already sustained analogous claims under §12 of the Securities

14    Act against Goldman Sachs.  *WaMu I*, 259 F.R.D. at 508.  Goldman Sachs provides the Court with no

15    basis to reverse itself now.

16    Goldman Sachs argues it cannot be liable for the false Offering Circulars it used to sell the

17    Preferred Trust Securities because it "was under ***no legal duty to investigate***" the veracity of these

18    statements.   IP Mem. at 20 (emphasis in original).   This is a preposterous interpretation of

19    §§25401/25501.  Goldman Sachs cites no authority in which any court has ever granted a motion to

20    dismiss claims under §§25401/25501 on the basis of this affirmative defense.

21    As a matter of law, there is a duty to speak truthfully and disclose all material facts when

22    offering to sell securities in California.  *See* §§25401, 25400(d), 25500.  The affirmative defense set

23    forth in §25501 "is substantially taken from Section 12(a)(2) of the Federal Securities Act of 1933."

---

25    [15] *See also In re Enron Corp. Sec. Litig.*, No. H-01-3624, 2005 U.S. Dist. LEXIS 39927, at *83 (S.D.

26    Tex. Dec. 5, 2005) ("the arguments of Goldman Sachs based on due diligence and reliance on financial statements expertised by Arthur Andersen's review are clearly defenses not properly raised to a 12(b)(6) motion; indeed they raise fact issues that may even preclude summary judgment")

1  Marsh & Volk, *supra* §14.03[3][a].  "[T]he duty of 'reasonable care' stated in Section 12(a)(2) …

2  require[s] some investigation of the facts before statements are asserted to be true."*Id.* at §14.03[3][b].

3  As a matter of California statutory law, Goldman Sachs had a duty to perform due diligence before

4  selling the Preferred Trust Securities in California.

5      Goldman Sachs asserts that because "this was a private placement exempted under Rule

6  144A[,]" Goldman Sachs was under no duty to perform any steps to discover the untrue statements in

7  the Offering Circulars.  IP Mem. at 15-16.  *See also id.* at 1 ("Plaintiffs grossly misstate the role and

8  obligations of the Initial Purchasers in these ***private*** offerings of securities under Rule 144A, which are

9  exempt from SEC registration and disclosure requirements." (emphasis in original)); *id.* at 10 (same).

10  The fact that the offerings were made pursuant to Rule 144A is irrelevant to F&C's claims under

11  California law.  Indeed, Rule 144A expressly states:  "***Nothing in this section obviates the need for***

12  ***any person to comply with any applicable state law relating to the offer or sale of securities***."  17

13  C.F.R. §230.144A Preliminary Note 5.  Any exemption from federal registration requirements did not

14  obviate Goldman Sachs' obligation to comply with California's Corporations Code.

15      Goldman Sachs' reliance upon *Northwestern Mut. Life Ins. Co. v. Banc of Am. Sec. LLC*, 254

16  F. Supp. 2d 390, 401 (S.D.N.Y. 2003) is misplaced.  IP Mem. at 8, 10, 12, 16, 20.  *Northwestern*

17  concerned a Rule 144A private offering in which plaintiffs sued under Wisconsin law only, not

18  California law.

19      In addition, as a matter of accepted industry practice, Goldman Sachs was obligated to perform

20  some investigation of the truth of the statements in the Offering Circulars.  Georgetown law professor,

21  and testifying expert (on behalf of the underwriters) in the *Enron* and *WorldCom* securities litigations,

22  Robert J. Haft has written:  "The first is perhaps the most basic principle: ***Perform appropriate due***

23  ***diligence for every offering regardless of whether it is registered or not***. ...  ***The director or***

24  ***underwriter cannot blindly rely on the truthfulness of information supplied by the issuer***."  Robert J.

25  Haft, *Due Diligence in Securities Transactions*, §2.01, at 2-1 (West Group 1999-2001) (Thorpe Decl.,

26  Ex. B).  "A due diligence investigation is ***a critical component*** in an initial purchaser's decision

27  whether to undertake an offering [pursuant to Rule 144A], enabling the prospective purchaser to

28

33

1    evaluate the relevant legal, business, and reputational risks."  Lloyd S. Harmetz, *Frequently Asked*

2    *Questions About Rule 144A*, Morrison & Foerster LLP (2009) (Thorpe Decl., Ex. C) at 14.[16]

3            Finally, Goldman Sachs was clearly in a position to observe blatant "red flags" indicating the

4    Offering Circulars contained false and misleading statements, making any reliance upon management's

5    representations unreasonable.  *See* ¶¶115-42.[17]  As the affirmative defense set forth in §25501 is

6    substantially taken from §12(a)(2) of the Federal Securities Act, federal case law is instructive: "Where

7    red flags appear, the underwriter must 'look deeper and question more' in its due diligence

8    investigation.  'The existence of red flags can create a duty to investigate ***even audited financial***

9    ***statements***.'"  *Enron*, 2005 U.S. Dist. LEXIS 39927, at *81 (collecting cases).  Here, Goldman Sachs'

10   obligation to investigate is even stronger, because Defendants' false statements were not confined to

11   WaMu's audited (*i.e.*, expertised) financial statements.  Whether or not Goldman Sachs "exercised

12   reasonable care" in investigating the truth of the Offering Circulars is not a question that the Court can

13   answer on the face of the Amended Complaint.[18]

14   ///

15   ///

16   ///

17   ///

18

19   [16] *See also Enron*, 2005 U.S. Dist. LEXIS 39927 *82 ("'"Tacit reliance on management assertions is
     unacceptable; the underwriters must play devil's advocate'" and demonstrate a "high degree of care in
20   investigation and independent verification of the company's representations."'" (collecting cases)).

21   [17] For instance, Goldman Sachs underwrote over $10 billion in MBSs backed by WaMu subprime
     loans, and Goldman Sachs had a duty to review WaMu's loan data and quality control random testing
22   of compliance with underwriting – which would have indicated WaMu's loans were not originated
     pursuant to WaMu's underwriting standards.  ¶¶123-125.  Furthermore, Goldman Sachs knew internally
23   that subprime and other non-conforming loans – like those on WaMu's balance sheet – were
     substantially overvalued and the mortgage market would soon correct, exposing WaMu to significant
24   credit and enterprise risk.  ¶¶126-141.

25   [18] The Initial Purchaser Defendants' arguments that they "disclaimed" liability for the veracity of the
     Offering Circulars, and that F&C's reliance was unreasonable in light of the disclaimers (IP Mem. at
26   16), are irrelevant to the analysis under §§25401/25501.  Goldman Sachs does not raise these issues in
     seeking to dismiss the §§25401/25501 claims.  Accordingly, F&C responds to these issues in
27   §§V.C.2.b. and V.C.2.c, *infra*.

28
                                                      34

**2.      The Officer Defendants Are Liable for Materially Assisting
Goldman Sachs Pursuant to California Corporations
Code §25504.1**

Flaherty & Crumrine's Sixth Cause of Action states a claim pursuant to §25504.1 against the

Officer Defendants for materially assisting Goldman Sachs' violation of §25401.  *See* ¶285.  Other than

incorporating by reference Goldman Sachs' argument with regard to the primary violation under

§25401, the Officer Defendants do not move to dismiss the allegations pursuant to §25504.1.  *See* OD

Mem. at 8-9.

"'Section 25504.1 of the Act provides that any person who "materially assists" in a violation of

section 25401, "with intent to deceive or defraud, is jointly and severally liable with any other person

liable" for the violation.'"  *Collins v. Winex Invs., LLC*, No. 08 CV 51-L (CAB), 2009 U.S. Dist. LEXIS

25553, at *15 (S.D. Cal. Mar. 27, 2009).  The Officer Defendants need not have actually participated in

the drafting of the Offering Circulars to be liable under §25504.1.  *Apollo Capital Fund LLC v.

Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 255-57 (2007).

Flaherty & Crumrine more than sufficiently pleads that the Officer Defendants "materially

assisted" Goldman Sachs' violation of §25401 with "intent to deceive or defraud."  *See* §III.  Indeed,

because the Officer Defendants only move to dismiss the §25504.1 cause of action on the grounds that

Goldman Sachs did not commit the predicate violation under §25401, and Flaherty & Crumrine pleads

a claim against Goldman Sachs (*see* §V.B.1.), the Officer Defendants' motion should be denied.

**3.      The Officer Defendants Violated California Corporations
Code §§25400/25500**

Section 25400(d) prohibits the making of a "statement which was, at the time and in the light of

the circumstances under which it was made, false or misleading with respect to any material fact, or

which omitted to state any material fact necessary in order to make the statements made, in the light of

the circumstances under which they were made, not misleading, and which he knew or had reasonable

ground to believe was so false or misleading."  Section 25500 provides investors with a private right of

action to recover civilly from violators of §25400(d).   "The very purpose of these statutes

[§§25400/25500] is to 'afford the victims of securities fraud with a remedy without the formidable task

35

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

1  of proving common law fraud.'" *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1102 (1993). "'There is no

2  requirement under these sections [§§25400/25500] that the plaintiff rely upon the statements or acts of

3  the defendant or even that he be aware that the defendant made them or engaged in them.'" *Id.* at 1103.

4  "The principal limitation of section 25400(d) as a general remedy for securities fraud appears to

5  be the requirement that the party making the misrepresentation be a 'broker-dealer or other person

6  selling or offering for sale or purchasing or offering to purchase the security.'  To satisfy this

7  requirement, the plaintiff must prove that ***the defendant was engaged in market activity*** at the time of

8  the misrepresentations." *Mirkin* 5 Cal. 4th at 1123.  Simply selling one's own shares in the market

9  satisfies the requirement that the defendant was "engaged in market activity." *Id.*

10  In *StorMedia Inc. v. Superior Court*, 20 Cal. 4th 449 (Cal. 1999), the California Supreme Court

11  held that where a company sold common stock through an employee purchase plan, even though the

12  sales were not on the open market or made to the plaintiffs in the action, the "seller" requirement of

13  §25400(d) was satisfied.

14  The Officer Defendants move to dismiss F&C's Fifth Cause of Action under §§25400/25500,

15  asserting "Plaintiffs have not alleged that the WaMu Officers sold, bought, or offered to sell or buy any

16  securities, and therefore, Count Five fails to state a claim." OD Mem. at 8.  The Court may take judicial

17  notice of the undisputed fact, as set forth in SEC filings signed by the Officer Defendants, that the

18  Officer Defendants sold WaMu securities and therefore were engaged in market activity sufficient to

19  satisfy the "seller" requirement of §25400(d).  Defendants Killinger, Casey, Rotella, Cathcart and

20  Schneider each sold Washington Mutual shares in 2006 and 2007.  *See* Thorpe Decl. Ex. D.

21  **C.**     **F&C Properly Pleads Additional California State Law Claims**

22  **1.**     **The Officer Defendants Are Liable**
23  **for Common Law and Statutory Fraud**

24  The elements of common law fraud are: (i) a misrepresentation, which may include false

25  representation, concealment or nondisclosure; (ii) knowledge of falsity (scienter); (iii) intent to defraud,

26  *i.e.*, to induce reliance; (iv) justifiable reliance; and (v) damage to the plaintiff. *Alliance Mortgage Co.*

27

28

36

1  *v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995).[19]  The Officer Defendants' only argument to dismiss the

2  California fraud claims, that F&C fails to plead reliance (*see* OD Mem. at 4-5), is without basis.  *See*

3  *supra*, §V.A.1.

4  ## 2.   All Defendants Are Liable for Negligent Misrepresentation

5  "The elements of negligent misrepresentation are (1) the misrepresentation of a past or existing

6  material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce

7  another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5)

8  resulting damage.  In contrast to fraud, negligent misrepresentation does not require knowledge of

9  falsity.  A defendant who makes false statements "'honestly believing that they are true, but without

10  reasonable ground for such belief, … may be liable for negligent misrepresentation.'"  *Apollo*, 158

11  Cal. App. 4th at 243.

12  As "the complaint states a claim for fraud against [the Officer Defendants] based on the

13  affirmative oral [and written] representations[,] necessarily means it states a claim for negligent

14

15  [19]    F&C also asserts claims pursuant to California Civil Code §§1709 and 1710 for deceit. California Civil Code §1709 provides:

16
17  > Fraudulent Deceit.  One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.

18  California Civil Code §1710 provides:

19  > Deceit, What.  A deceit, within the meaning of the last section, is either:

20
21  > 1.    The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

22  > 2.    The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

23
24  > 3.    The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

25  > 4.    A promise, made without any intention of performing it.

26  In particular, §1710(2) is a cause of action for deceit through negligent misrepresentation, and does not
27  require scienter or intent to defraud.  *See Small v. Fritz Cos.*, 30 Cal. 4th 167, 173-74 (2003).

28

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.:  (760) 579-7368 Fax: (760) 579-7369

1   representation." *Apollo*, 158 Cal. App. 4th at 243-44.  Again, the Officer Defendants' only argument

2   for dismissal of the negligent misrepresentation claims, that F&C fails to plead reliance (*see* OD Mem.

3   at 4-5), is without merit.  *See supra,* §V.A.1.[20]

4               a)        **The Director Defendants Are Liable for the False and**
                          **Misleading Statements Attributable to Them**
5

6       F&C pleads the Director Defendants negligently authorized the sale of the Preferred Trust

7   Securities pursuant to false and misleading offering circulars and negligently made false and misleading

8   statements included in the 2006 and 2007 Offering Circulars, including statements contained in

9   WaMu's Form 10-K filings **signed by the Director Defendants** and incorporated by reference in the

10  Offering Circulars.  ¶¶45, 143, 146, 176, 184.  The Director Defendants move to dismiss asserting the

11  Amended Complaint fails to allege the Director Defendants' role in drafting the false and misleading

12  statements at issue, and that F&C relies upon the discredited group pleading doctrine.  DD's Mem. at

13  10-12.  The Director Defendants misstate the law.

14      In the Ninth Circuit, "***directors who sign or prepare financial disclosures can be held liable***

15  ***for misstatements and omissions therein***."  *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986,

16  1011 (N.D. Cal. 2007).  *See also In re Maxim Integrated Prods.*, 574 F. Supp. 2d 1046, 1063 (N.D. Cal.

17  2008) ("A director who signs a financial disclosure may be held liable for any misrepresentations in the

18  _____

19  [20] The Director Defendants similarly move to dismiss the negligent misrepresentation claim for lack of
    reliance.  DD Mem. at 12-14.  F&C, however, actually read and relied upon the false and misleading
20  statements, and pleads the "who, what, when, and where" of each statement relied upon and which is
    alleged to be false and misleading.  *See, e.g.,* ¶¶24, 143-219, 271.  The Director Defendants' cases are
21  inapposite.  In *Neubronner v. Milken*, 6 F.3d 666, 673 (9th Cir. 1993), the court found reliance had not
    been properly pleaded because the plaintiff had purchased common stock, but the allegedly false
22  prospectus concerned "an offering of convertible debentures in which he did not invest, and which was
    distributed a full year before he purchased any [common] shares.  Moreover, he does not state the
23  content of any allegedly false and misleading statements . . . ." *Id.*  Whereas the cursory allegation of
    reliance in *Neubronner* was easily rejected as both unsupported and contrary to common sense, the
24  Director Defendants' argument here – that professional investment adviser F&C did not read the
    Offering Circulars and WaMu's SEC filings before purchasing the Preferred Trust Securities – is both
25  contrary to the well-pleaded allegations and irrational. *Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th
    513 (2004) concerned injuries suffered as a result of asbestosladen insulation, and the plaintiff had "not
26  alleged that Anthony Cadlo was actually aware of, or was reassured by and relied on this
    misrepresentation when undertaking work in the presence of Kaylo dust." *Id.* at 520.  Here, unlike in
27  *Cadlo*, F&C has pleaded it was aware of and relied upon Defendants' false and misleading statements.

28                                              38

disclosure."). "[S]igners of documents should be held responsible for the statements in the document. … '[T]he affixing of a signature is not a mere formality, but rather signifies that the signer has read the document and attests to its accuracy.'" *Howard v. Everex Sys.*, 228 F.3d 1057, 1061 (9th Cir. 2000) (directors who sign SEC filings are liable as primary violators of the securities laws for false statements contained therein).

In effect, the Director Defendants are asserting that they did not "make" or "create" the statements contained in the Form 10-K filing they signed. DD Mem. at 10 ("plaintiffs do not allege that the Outside Directors played any role in the creation of the Forms 10-K"). Not true. A "director signing a document filed with the SEC … *"makes or causes to be made"* the statements contained therein." *Howard*, 228 F.3d at 1061.

The Director Defendants set up a straw man by incorrectly asserting F&C relies on the group published doctrine. F&C does not rely on the doctrine at all. In the cases cited by the Director Defendants, such as *Wojtunik v. Kealy*, 394 F. Supp. 2d 1149 (D. Ariz. 2005), the plaintiff relied "on the 'group pleading' or 'group publishing' doctrine to support both the particularity *and scienter* aspects of the Amended Complaint." *Id.* at 1163. F&C does *not* have to establish the Director Defendants acted with scienter, and has adequately pleaded that the Director Defendants "made" the statements in the Form 10-Ks by signing those documents. *See, e.g., In re LDK Solar Sec. Litig.*, No. C 07-05182 WHA, 2008 U.S. Dist. LEXIS 80717, at *25 (N.D. Cal. Sept. 24, 2008) (collecting cases and holding: "The mere signing of a prospectus or other SEC filing does not, of course, alone establish scienter, but it does establish that the individual made or approved the allegedly false statement."). The Director Defendants may be found liable for the statements in the Form 10-Ks they signed.

Finally, the Director Defendants argue F&C does "not allege that the Outside Directors played any role in the creation, review or approval of the Offering Circulars." DD Mem. at 9. This is not true. *See* ¶45 (directors authorized the sale of the notes pursuant to the Offering Circulars).[21] The Director

---

[21] Defendants would have this Court reach the absurd, and unsupported, conclusion that WaMu issued the $2.25 billion in Preferred Trust Securities *without* the approval and authorization of its board of directors and the finance and audit committees tasked with oversight of such activities. ¶¶108-112.

39

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

1  Defendants cite only one authority – *In re Nat'l Century Fin. Enters., Inv. Litig.*, 504 F. Supp. 2d 287,

2  297-98 (S.D. Ohio 2007) – for the proposition that "courts have declined to assume that outside

3  directors are responsible for the contents of offering documents."  DD Mem. at 10.   The Director

4  Defendants misstate the holding of *Nat'l Century*.   While the court held that plaintiff "MetLife's

5  Section 10(b) [fraud-based] claim against the Outside Directors must be dismissed[,]" the court also

6  held "MetLife's complaint sufficiently states a claim for negligent misrepresentation [against the

7  Outside Directors.]" *Nat'l Century*, 504 F. Supp. 2d at 300, 324.   As F&C brings negligent

8  misrepresentation claims against the Outside Directors (not §10(b) fraud claims), *Nat'l Century*

9  supports upholding F&C's Amended Complaint.

10
11              **b)**       **F&C Justifiably Relied Upon the Initial Purchasers'**
                          **Statements in the Offering Circulars; "Disclaimers" Do**
                          **Not Shield the Initial Purchasers from Liability**
12

13          F&C read and relied upon the Initial Purchaser Defendants' false and misleading statements in

14  the Offering Circulars.  ¶¶24, 50, 271.  Notwithstanding the requirement that the Court accept as true

15  the factual allegations in the Amended Complaint, the Initial Purchaser Defendants assert they cannot

16  be liable for the false and misleading Offering Circulars because "all of the purported misstatements

17  upon which Plaintiffs relied were provided by WaMu, not the Initial Purchasers." IP Mem. at 16.  In

18  contrast, the Amended Complaint clearly pleads the Initial Purchasers "participated in the review and

19  drafting of the Offering Circulars, approved the final Offering Circulars, solicited sales of the

20  Offerings," and "negligently failed to disclose" the truth concerning WaMu. ¶¶115, 142. *See also* ¶50.

21  In support of their dubious contention, the Initial Purchaser Defendants refer the Court to disclaimers in

22  the Offering Circulars that purport to limit the Initial Purchaser Defendants' liability for false and

23  misleading statements. IP Mem. at 16-17. These disclaimers are void as a matter of California law, and

24  courts have repeatedly and thoroughly rejected nearly identical self-serving provisions.

25          Negligent misrepresentation is a "form of deceit," *Bily v. Arthur Young*, 3 Cal. 4th 370, 407

26  (1992), liability for which the Initial Purchaser Defendants cannot escape via a boilerplate disclaimer.

27  California law rejects the efficacy of disclaimers, such as those at issue here, in which a party seeks to

28

40

1  avoid liability for deceit claims.  California Civil Code §1668 states:  "[A]ll contracts which have for

2  their object, directly or indirectly, to exempt anyone from responsibility for his own fraud … or

3  violation of law, **whether willful or negligent**, are against the policy of the law."  Similarly, the

4  California Corporations Code imposes upon sellers of securities an obligation to make truthful,

5  complete disclosures of material facts – an obligation that cannot be waived by a disclaimer.  *See*

6  §25701 ("Any condition, stipulation or provision purporting to bind any person acquiring a security to

7  waive compliance with any provision of this law … is void.").

8          Numerous courts have refused to limit the liability of initial purchasers in Rule 144A offerings

9  based upon the existence of boilerplate disclaimers in offering documents.  In *IDS Bond Fund, Inc. v.*

10  *Gleacher NatWest Inc.*, No. 99-116 (MJD/JGL), 2002 U.S. Dist. LEXIS 4073, at *20-*25 (D. Minn.

11  Mar. 6, 2002), the initial purchaser moved for summary judgment because a disclaimer in the offering

12  memorandum (or "OM") disclaimed responsibility for the accuracy or completeness of information in

13  the document.  The court rejected that argument, holding that the defendant "is an initial purchaser, and

14  … may be held liable for the alleged misrepresentations or omissions in the OM."  *Id.* at *22.  Other

15  courts to address the issue are in accord.  *See In re Nat'l Century Fin. Enters.*, 541 F. Supp. 2d 986,

16  1004-05 (S.D. Ohio 2007) (rejecting contention "no reasonable investor could have relied on any

17  misrepresentations in the offering materials after seeing the disclaimers" and noting "the disclaimer

18  stating that Credit Suisse had done no independent investigation would seem beyond credulity to

19  potential investors"); *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp*, 157 Cal.

20  App. 4th 835, 867 (2007) (upholding jury verdict against initial purchasers of Rule 144A offering and

21  holding "We are not persuaded that these disclaimers precluded reasonable reliance as a matter of

22  law."); *Gabriel Capital v. Natwest Fin., Inc.*, 94 F. Supp. 2d 491, 501-503 (S.D.N.Y. 2000) (rejecting

23  initial purchaser disclaimer defense).

24          The Initial Purchaser Defendants incorrectly rely upon the holding in *M&T Bank Corp. v.*

25  *Gemstone CDO VII, Ltd.*, 891 N.Y.S. 2d 578, 581 (N.Y. App. Div. 2009).  *See* IP Mem. at 16-17.  In

26  *M&T Bank Corp.*, the court dismissed certain causes of action because "[e]ssential to each of those

27  causes of action is the existence of **a special relationship of trust or confidence** and there is no such

28

41

1   special relationship in this case, particularly in light of the facts that the parties had no relationship prior

2   to this arms-length transaction and that [the] offering circulars contained the various limitations and

3   disclaimers." 891 N.Y.S. 2d at 581.[22]  Here, F&C's negligent misrepresentation claims are under

4   California common law (not New York common law), and California does not require the "existence

5   of a special relationship of trust or confidence" to state a claim for negligent misrepresentation.  The

6   disclaimers are of no relevance under California common law.  *M&T Bank Corp* is inapposite.[23]

7                                   **c)        The Initial Purchasers Had**
                                    **No Reasonable Grounds to Believe the Statements**
8                                   **in the Offering Circulars to be True**

9            As set forth in §IV, F&C's claims against the Initial Purchaser Defendants do not sound in

10  fraud.  Nonetheless, even under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of

11  a person may be averred generally."  Whether Defendants did or did not have reasonable grounds for

12  believing their false and misleading statements goes to Defendants' "state of mind."  *See*, *e.g.*, *Platt*

13  *Elec. Supply, Inc. v. EOFF Elec., Inc.,* 522 F.3d 1049, 1055 (9th Cir. 2008) ("without reasonable

14  ground for such belief" element of negligent misrepresentation is the "state of mind" requirement).

15  Accordingly, even assuming the application of Rule 9(b), F&C may simply make a general aversion

16  that the Defendants did not have reasonable grounds to believe their false and misleading statements to

17  be true.  F&C clearly pleads this element of its claim.  *See*, *e.g.*, ¶¶119, 269.

18           The Initial Purchaser Defendants argue:  "Plaintiffs' negligent misrepresentation claim must be

19  dismissed, because it does not plead ***with particularity*** that the Initial Purchasers made statements

20  ***without a reasonable ground for believing*** them to be true."  IP Mem. at 14.  There is no requirement

21

---

22  [22] *See also Wright v. Selle*, 811 N.Y.S. 2d 525, 527 (4th Dep't 2006) (New York common law negligent
    misrepresentation requires "a special relationship of trust or confidence, which creates a duty for one
23  party to impart correct information to another").

24  [23] Similarly, *Northwestern*, 254 F. Supp. 2d at 401, is inapposite in that it concerned Wisconsin law
    only, not California law.  *Bily*, 3 Cal. 4th at 402-03, 409, deals with the scope of auditor liability, and
25  says nothing about an initial purchaser's liability for selling securities to investors pursuant to a false
    and misleading offering circular.  The Initial Purchaser Defendants cite no authority in which a seller
26  of securities, in California and pursuant to false statements, was able to avoid liability on the basis of a
    disclaimer.
27

28                                                           42

1    that F&C plead the Initial Purchaser Defendants' state of mind with particularity.  The Initial Purchaser

2    Defendants cite no authority imposing such a requirement.  For instance, *Landmark Screens, LLC v.*

3    *Morgan, Lewis & Bockius LLP*, No. C 08-2581 JF (HRL), 2008 U.S. Dist. LEXIS 87646, at *22-*23

4    (N.D. Cal. Oct. 2, 2008) – an unpublished opinion in which negligent misrepresentation was not a

5    claim, but which the Initial Purchaser Defendants cite as if the case addresses negligent

6    misrepresentation specifically (IP Mem. at 14) – stands for the uncontroversial proposition that fraud

7    claims must comply with Rule 9(b).  Rule 9(b) does not require pleading the mental state of a negligent

8    misrepresentation claim with particularity.

9         The Initial Purchaser Defendants' "reasonable grounds" argument concerns an issue typically

10    reserved for the jury, and should not be addressed on the present factual record.  *See*, *e.g.*, *Edelstein v.*

11    *Ryland Corp.*, No. 95-56349, 1997 U.S. App. LEXIS 8123, at *5 (9th Cir. Apr. 18, 1997) (defendants'

12    "state of mind" for negligent misrepresentation claims "'are generally factual issues inappropriate for

13    resolution by summary judgment'").

14         Finally, the Initial Purchaser Defendants argument contradicts the well-pleaded facts.  F&C

15    pleads in great detail that the Initial Purchaser Defendants had access to extensive quality control

16    reports detailing adherence to WaMu's underwriting standards (¶¶101-106), the Initial Purchaser

17    Defendants reviewed and had access to the loan documents underlying billions of dollars of WaMu

18    MBSs underwritten by the Initial Purchaser Defendants (¶¶123-124), and the Initial Purchaser

19    Defendants (particularly Goldman Sachs) were writing down the value of subprime loans (like those

20    on WaMu's balance sheet) as the Initial Purchaser Defendants knew these loans were highly overvalued

21    (¶¶126-141).  Had the Initial Purchaser Defendants performed any reasonable due diligence and not

22    ignored blatant red flags, the true but undisclosed facts would have been readily apparent to them.

23    ¶119.

24           **D.**     **Flaherty & Crumrine Suffered a Legally Cognizable Economic Loss**

25         F&C's substantial investment in the Preferred Trust Securities is now practically worthless.

26    ¶16.  Defendants' false and misleading statements, including those made by the Initial Purchaser

27    Defendants, caused F&C to suffer the loss of its investment. ¶¶240-244.  Defendants' false and

28

43

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS          Dietrich Siben Thorpe LLP
No. 2:08-md-1919 MJP          2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
No. C09-1756 MJP          Tel.: (760) 579-7368 Fax: (760) 579-7369

1  misleading statements concealed WaMu's true financial condition and creditworthiness and, by doing

2  so, artificially inflated the price of the Preferred Trust Securities.  Defendants' false and misleading

3  statements concealed factors concerning the material risk that WaMu's financial condition would be

4  materially weakened and/or WaMu would be rendered bankrupt as a result of its undisclosed risky

5  lending practices, false appraisals and inadequate reserves for loan losses.  These undisclosed material

6  risks materialized, causing the market value of the Preferred Trust Securities to plummet to zero to the

7  detriment of Plaintiffs.  ¶242.

8       In California, "[t]ort damages are awarded to fully compensate the victim for all the injury

9  suffered.  There is no fixed rule for the measure of tort damages under California Civil Code section

10  3333.  The measure that most appropriately compensates the injured party for the loss sustained should

11  be adopted." *Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.*, 88 Cal. App. 4th 439, 446-47

12  (2001).  Indeed, a defrauded purchaser is entitled to recover the difference between the actual value of

13  the security at the time of the purchase and the value it would have had if the security had been as

14  represented.[24] *Phelps v. A.L. Jameson & Co.*, 6 Cal. App. 2d 546, 548 (1935) ("Without question the

15  proper measure of damages to be applied in an action to recover damages resulting from fraudulent

16  representations in a sale or exchange of property is the difference between the actual value of the

17  property purchased or received in exchange and the value it would have had had the property been as

18  represented.").  Indeed, damages are extremely broad in California and include an award for ***all harm***

19  that the defendant was a ***substantial factor*** in causing, even if the particular harm could not have been

20  anticipated.  *See, e.g.*, *Walker v. Signal Cos., Inc.*, 84 Cal. App. 3d 982, 995 (1978) (damages for fraud

21  are an "amount which will compensate for ***all the detriment caused thereby, whether it could have***

22  ***been anticipated or not***"); 1-1900 CACI 1923 & 1924.

23  ///

24

25  [24]      This same standard applies to F&C's negligent misrepresentation claims.  *Garcia v. Superior*
26  *Court*, 50 Cal. 3d 728, 745 (1990) (causation and damage elements of negligent misrepresentation claim
    are derived from the same rules governing fraud) (citing 5 B.E. Witkin, *Summary of Cal. Law: Torts*
27  §721, at 819-21 (9th ed. 1988)).

28                                                                44

1    Under §§25401/25501, F&C is entitled to a specific statutory measures of damages (which, as

2    set forth *supra*, at §V.B.1, does not require proof of loss causation), that is contrary to the Initial

3    Purchaser Defendants' arguments here.  Section 25501 provides that "[a]ny person who violates

4    Section 25401 shall be liable to the person who purchases a security from him or sells a security to him,

5    who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be,

6    no longer owns the security)."  The measure of recoverable damages "shall be an amount equal to the

7    difference between (a) the price at which the security was bought plus interest at the legal rate from the

8    date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the

9    amount of any income received on the security by the plaintiff."

10    Despite this clear authority, the Initial Purchaser Defendants incredibly request that the Court

11    dismiss F&C's claims for negligent misrepresentation and violations of §25401 because Plaintiffs "do

12    not allege that they did not receive any required payment from their Trust Securities while they owned

13    them."  IP Mem. at 24.[25]  The Initial Purchaser Defendants offer no legal authority to support their

14    argument that damages under California law are limited to loss of distribution payments, rather than (i)

15    the difference between the purchase price of the Preferred Trust Securities and their actual value, or (ii)

16    rescission.  Indeed, the Initial Purchasers' argument is contrary to the clear language of §25401.

17    Further, California common law holds just the opposite, and has for more than 75 years. *See Housley v.*

18    *City of Poway*, 20 Cal. App. 4th 801, 812 (1993) (one defrauded in the purchase, sale or exchange of

19    property is entitled to recover the difference between the actual value of that which the defrauded

20    person parted and the actual value of that which he received); *Kendrick v. Schwartz*, 69 Cal. App. 2d

21    171, 175 (1945) (holding that "one who is defrauded in the purchase of property is entitled to recover

22    'the difference between the actual value of that with which the defrauded person parted and the actual

23    value of that which he received'"); *Zinn v. Ex-Cell-O Corp.*, 24 Cal. 2d 290, 297(1944) (holding that the

24    measure of damages for fraudulent procurement or sale of capital stock was the difference in actual

25

26    [25]  Furthermore, the Initial Purchaser Defendants' argument ignores the fact that F&C's Preferred Trust
Securities were converted into worthless Washington Mutual, Inc. preferred stock, without the benefits

27    of any distributions, upon WaMu's bankruptcy filing. ¶16.

28

CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
No. 2:08-md-1919 MJP
No. C09-1756 MJP

Dietrich Siben Thorpe LLP
2173 Salk Avenue, Suite 250, Carlsbad, CA 92008
Tel.: (760) 579-7368 Fax: (760) 579-7369

1    value between what stockholders received and what the shares were in fact worth); *Dyer v. Hunter*, 133

2    Cal. App. 267, 269-70 (1933) (same); *Pourroy v. Gardner*, 122 Cal. App. 521, 533 (1932) (same).

3            Additionally, the Initial Purchaser Defendants misconstrue F&C's allegations as a "speculative

4    injury" seeking damages "for an increase in the risk that the securities will not perform in the future."

5    IP Mem. at 24.  However, the Initial Purchaser Defendants concede that F&C "allege that the 'market

6    value of the 2006 and 2007 Preferred Trust Securities declined' and that they purchased the Trust

7    Securities at 'artificially inflated' prices" – the very same purchase price inflation measure of damages

8    expressly endorsed under California law.  IP Mem. at 24, (quoting ¶¶241-42).[26]

9            Accordingly, the Initial Purchasers Defendants' motion should be denied with respect to their

10   economic loss argument.

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23

24   [26] The Initial Purchaser Defendants' cases are inapposite.  IP Mem. at 24 n.15.  Neither *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994), nor *Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576 (E.D. Pa. 2009), address damages under California

25   law.  In addition, *First Nationwide Bank* only stands for the unremarkable presumption that a plaintiff cannot recover when "actual damages it will suffer, if any, are yet to be determined." 27 F.3d at 768.

26   Likewise, in *Luminent Mortgage Capital*, the plaintiff only alleged a loss it "***might***" suffer rather than losses it "'actually ***did***'" suffer.  652 F. Supp. 2d at 591.  This is not the case here.

27

28
                                                     46

1

## VI.   <u>CONCLUSION</u>

2      For all of the foregoing reasons, Defendants' motions should be denied in their entirety.[27]

3   DATED:   April 7, 2010                          Respectfully submitted,

4                                                   DIETRICH SIBEN THORPE LLP

5                                                   By:   */s/ David A. Thorpe*

6                                                       David A. Thorpe
                                                        Edward P. Dietrich
7                                                       Matthew P. Siben
                                                        2173 Salk Avenue, Suite 250
8                                                       Carlsbad, CA 92008
                                                        Tel.:        (760) 579-7368
9                                                       Fax:         (760) 579-7369
                                                        Email:       david@dstlegal.com
10                                                                   edward@dstlegal.com
                                                                     matthew@dstlegal.com
11
                                                    *Attorneys for Plaintiffs Flaherty & Crumrine*
12                                                  *Preferred Income Fund Incorporated, Flaherty &*
                                                    *Crumrine Preferred Income Opportunity Fund*
13                                                  *Incorporated, Flaherty & Crumrine/Claymore*
                                                    *Preferred Securities Income Fund Incorporated,*
14                                                  *Flaherty & Crumrine/Claymore Total Return Fund*
                                                    *Incorporated, and Flaherty & Crumrine Investment*
15                                                  *Grade Fixed Income Fund*

16

17

18

19

20

21

22

23

24   _____

25   [27] The allegations in the Complaint should be upheld; however, if for any reason the Court should deem
     the allegations lacking, F&C respectfully requests leave to amend the Complaint. *See* Fed. R. Civ. P.
26   15(a) (leave to amend "shall be freely given when justice so requires"); *Eminence Capital, LLC v.*
     *Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (leave to amend should be granted liberally).
27

28                                                  47

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on April 7, 2010, I filed the foregoing with the Clerk of the Court

3  using the CM/ECF system, and served all parties via ECF.

4  DATED:  April 7, 2010                    DIETRICH SIBEN THORPE LLP

5                                           By:___*/s/ David A. Thorpe*_____

6                                              David A. Thorpe
                                               Edward P. Dietrich
7                                              Matthew P. Siben
                                               2173 Salk Avenue, Suite 250
8                                              Carlsbad, CA 92008
                                               Tel.:        (760) 579-7368
9                                              Fax:         (760) 579-7369
                                               Email:    edward@dstlegal.com
10                                                        matthew@dstlegal.com
                                                          david@dstlegal.com
11
                                               *Attorneys for Plaintiffs Flaherty & Crumrine*
12                                             *Preferred Income Fund Incorporated, Flaherty &*
                                               *Crumrine Preferred Income Opportunity Fund*
13                                             *Incorporated, Flaherty & Crumrine/Claymore*
                                               *Preferred Securities Income Fund Incorporated,*
14                                             *Flaherty & Crumrine/Claymore Total Return Fund*
                                               *Incorporated, and Flaherty & Crumrine Investment*
15                                             *Grade Fixed Income Fund*

16

17

18

19

20

21

22

23

24

25

26

27

28